## FRAZIER v. HANLON GASOLINE CO. et al.
### No. 675.

Court of Civil Appeals of Texas. Eastland.
May 16, 1930.

Rehearing Denied June 20, 1930.

J. G. Harrell, of Breckenridge, for appellant.

Lyndsay D. Hawkins, of Breckenridge, for appellees Clark and Johnson.

Chas. H. Clark, of Breckenridge, pro se.

Robert E. Bowers, of Breckenridge, for appellee Heatley.

P. B. Carroll, of Breckenridge, for appellee Hanlon Gasoline Co.

Goggans & Allison, of Breckenridge, for appellees Jones and others.

LESLIE, J.

The Cosden Oil & Gas Company, while owner of an oil and gas lease, constructed a large earthen tank upon the leased land and made sales of the impounded water to adjoining lease owners for drilling purposes. A controversy with the landowner arose over the asserted right to sell the water to such lease owners, and, in compromise of litigation between A. J. Jones, the owner of the land, and said company, the latter, on October 23, 1924, released its claim to any interest in the lake, and quitclaimed to Jones all existing contracts for the sale of water from the same, effective November 1, 1924.

In said litigation Clark & Johnson were attorneys for Jones, and on October 17, 1924, Jones, in consideration of their services performed, and of specified services undertaken to be thereafter performed by them, did, in writing, "vest parties of the second part (i. e. Clark & Johnson) with one-half interest in whatever revenue that might be realized from the sale of water out of said tank, said interest to be vested in parties of the second part on and after the 1st day of November, 1924." That contract is to the tenor following:

"The State of Texas, County of Stephens.

"Know all men by these presents: the following contract and agreement made and entered into by and between A. J. Jones, hereinafter called Party of the First Part, and Chas. H. Clark and T. Edgar Johnson, hereinafter called Parties of the Second Part; witnesseth,

"That whereas, Party of the First Part formerly employed parties of the Second Part to institute suit against Cosden Oil & Gas Company for damages by reason of the sale of water by the Cosden Oil & Gas Company out of the tank located on the North East Quarter of Section 19, Lunatic Asylum Land, Stephens County, Texas, said land belonging to party of the First Part; and

"Whereas, a suit was instituted in behalf of the Party of the First Part by parties of the Second Part against said Cosden Oil & Gas Company, and same is now pending in the Federal Court at Abilene, Texas; and

"Whereas, a compromise is about to be effected with the Cosden Oil & Gas Company, wherein the Cosden Oil & Gas Company, among other things, is to release, relinquish and quitclaim all of its right, title and interest in and to said tank and any contracts it might have for the sale of water therefrom, and the Party of the First Part under said compromise settlement is to be entitled to all of the revenue that might be derived from the sale of water out of said tank after the First day of November, 1924:

"Now therefore, for and in consideration of the services rendered by the Parties of the Second Part and to be rendered by said parties as hereinafter set out, Party of the First Part does hereby vest Parties of the Second Part with one-half interest in whatever revenue that might be realized from the sale of water out of said tank, said interest to be

vested in parties of the Second Part on and after First day of November, 1924.

"It is also understood and agreed that as a part of the compensation to be paid Parties of the Second Part for their services rendered in looking after the suit and claim against the Cosden Oil & Gas Company, they are to receive one-half of whatever cash is realized in the settlement with Cosden, but out of their one-half Party of the First Part, A. J. Jones, is to be reimbursed for whatever money he has been out in the way of costs advanced on the suit filed.

"As a further consideration of the Party of the First Part conveying to Parties of the Second Part a one-half interest in the revenues that might be realized from the sale of water out of the above described tank on and after November 1, 1924, parties of the second part agree and obligate themselves to look after said tank and all contracts pertaining to the sale of the water and are to collect for the sale of the water and deposit to the credit of A. J. Jones, Party of the First Part, in the First National Bank of Breckenridge, Texas, one-half of all the revenue collected from the sale of water out of said tank, it being understood and agreed that Party of the First Part will not have to worry about or be bothered with the collecting of said revenue, and parties of the second part are to use their best efforts to obtain out of said tank as great a revenue for the Party of the First Part as can be reasonably obtained.

"Witness our hands this the 17th day of October, A. D., 1924.

"A. J. Jones
"Party of the First Part.
"Chas. H. Clark
"T. Edgar Johnson,
"Parties of the Second Part.

"The State of Texas, County of Stephens.

"Before me, the undersigned authority on this day personally appeared A. J. Jones, Chas. H. Clark and T. Edgar Johnson, each well known to me to be the persons whose names are subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

"Given under my hand and seal of office this the 17th day of October, A. D., 1924.

"C. E. Martin,
"Notary Public, Stephens County, Texas.
"[Seal.]

"Appendix: It is understood and agreed the equipment on said tank is to remain there as long as revenue from tank is a paying proposition, and for five months thereafter. After expiration of five months A. J. Jones will have the right to sell said equipment."

This clause is added before signing.

"A. J. J.
"C. J. C.
"T. E. J."

Pursuant to said contract, and by virtue of such understanding with A. J. Jones, Clark & Johnson took charge and control of said tank, and proceeded to market the water to various customers, at times under oral contracts and at other times by written contracts.

A. J. Jones died testate January 26, 1926. Prior thereto Clark & Johnson, under their arrangements with him, effected a written contract with Hurley Texas Gasoline Company and the Hur-Bar Gasoline Company, whereby they agreed to take the water for the sum of $500 per month, beginning May 1, 1925, and expiring May 1, 1927. Later Hanlon Gasoline Company acquired the rights and privileges of the Hurley Texas Gasoline Company and the Hur-Bar Gasoline Company under said contract, and assumed the obligations of said companies.

Subsequent to the expiration date of the contract (i. e. May 1, 1927), and up to May 1, 1929, Hanlon Gasoline Company, under the authority derived from Clark & Johnson, and with the acquiescence of G. P. Jones, executor and trustee of A. J. Jones' estate, pumped water from said lake. From May 1, 1927, to August 8, 1927, the Hanlon Gasoline Company, under the arrangements perfected through Clark & Johnson, paid them as "agents for A. J. Jones estate" $1,612.91, and from August 8, 1927, to June 1, 1928, it paid them $4,887.09, of which sums Clark & Johnson retained one-half, as per the terms of the contract set out above, and paid the other one-half over to the executor and trustee, G. P. Jones, who distributed it among the heirs of said estate, according to their several interests therein. After June 1, 1928, payments for water were withheld, amounting to $5,500. This sum Hanlon Gasoline Company in this suit tendered for payment to whomever should be adjudged entitled to it. It was agreed that the reasonable cash market value of the water pumped from the lake by Hanlon Gasoline Company after "January 26th, 1926 (the date of A. J. Jones' death) was and is the sum of $500.00 per month, at the time and place of its pumping."

The will of A. J. Jones, after specific money bequests, devised the real estate to certain named heirs in fractional proportions. G. P. Jones was named executor and trustee. Provisions were made for the distribution of the estate by means of a partition suit which the executor and trustee was directed to file. On the 13th day of July, 1926, the executor and trustee filed a partition suit in the district court of Stephens county, being No. 7211, styled G. P. Jones et al. v. Dan J. Jones. Upon the trial of this cause the court, by its judgment of date July 13, 1926, established the interests of the various devisees and adjudged the land susceptible of partition in kind. Commissioners were appointed to make partition as decreed. The report of the commissioners, filed at a subsequent term of

court, allotted, along with several other tracts, the surface of a tract of 89.5 acres situated in Stephens county, being the same land upon which the tank or lake in question is located, to Bryant Heatley, "free of any and all claims of the other allottees named in this report." That report contains the following recitals and recommendations:

"Paragraph XI of the will of A. J. Jones, deceased, provides, among other things: 'In making division of my real estate situated in Stephens County, Texas, in the partition above provided for, only the surface thereof shall be divided, and all minerals and mineral rights in or under said lands, and all rents, royalties and income and revenue derived from such minerals or mineral rights shall, for a period of five (5) years after my death, be considered a part of my general estate to be held in trust during said five years by my executor and trustee and all profits, revenues, incomes, royalties and rentals derived during said five year period from said minerals or mineral rights, and from the sale or leasing thereof, or under the terms of any contract relating thereto, shall be regarded as a portion of my general estate and shall, as such, be received by my said executor and trustee, and by him paid over from time to time, and at least once each year, to the persons entitled thereto, under the terms and provisions of this will.'

"Therefore, in making said partition and allotment we have not undertaken to divide the mineral rights in, on or under the lands in Stephens County, Texas, but have left the same as provided by the terms of said will; and hereafter in this report where reference is made to a division and partition of the Stephens County lands, it is understood that only the surface of such Stephens County lands is partitioned and divided, and not the mineral rights in, on or under said lands, and not the rentals, royalties and income and revenue derived from such minerals and mineral rights; such mineral rights, rentals, royalties, income and revenue being left intact as provided in said will.

"We also understand that certain water is being sold or used from time to time from a lake or lakes now situated on some of the Stephens County, Texas, lands involved herein, and we have not undertaken to make any apportionment of the funds received or to be received from the proceeds of such sale, and we recommend and intend that such proceeds be paid into the general or common funds of the A. J. Jones estate to be divided and distributed from time to time among all the parties interested in said estate in proportion to their respective interests, and also that proper rights of way and easements be continued and allowed from time to time over, along and across any of the land owned by A. J. Jones in his lifetime, to permit and allow reasonable access to use of and transportation of said waters."

The report of the commissioners and the recommendations by them made were, by judgment of the court of date January 26, 1927, approved, the judgment in confirmation thereof decreeing: "Said partition and distribution as shown in said report have been fairly and equitably made, according to law and the order of this court."

Both judgments, the one ordering partition of the property, and the one at the subsequent term approving and confirming the report of the commissioners of partition, became final; there being no appeal from either.

On August 8, 1927, Bryant Heatley and wife conveyed the 89.5-acre tract to Pat Frazier by warranty deed containing no mention of the lake or water rights. Some ten months subsequent to this conveyance, and on June 16, 1928, Pat Frazier filed this suit against G. P. Jones, executor and trustee of the A. J. Jones estate, and Hanlon Gasoline Company to recover the value of the water pumped out of the lake since the date of his deed. By subsequent amendments Chas. H. Clark and T. Edgar Johnson, called Clark & Johnson herein, and all parties to the former partition suit, were made defendants, except Mrs. Rebecca Simmons, a widow, and Joe Jones, a minor, who were averred to be dead. Plaintiff's pleadings upon which the case was tried presented a case in the form of trespass to try title, with a claim for damages for the conversion of water from the lake. An alternative claim was that, if it should be found that Hanlon Gasoline Company was taking the water under a valid contract, then plaintiff should have judgment against Clark & Johnson and G. P. Jones, executor and trustee, for $10,000 'as for money had and received by them unlawfully under said contract.

Clark & Johnson, among other defenses, defended upon the ground that their contract of October 17, 1924, with A. J. Jones, granted them an interest in the land upon which the tank was located, and that the same was recognized by all interested parties and protected by the decree of partition. G. P. Jones, individually and as executor and trustee, and the other parties who were devisees under the will of A. J. Jones, asserted a cross-action against Clark & Johnson and Hanlon Gasoline Company, by which they contended that Clark & Johnson had no rights under their contract of October 17, 1924, which survived the death of A. J. Jones, and contended for a judgment for the value of all water taken after the death of Jones, and praying that the claim of Clark & Johnson be canceled and removed as a cloud upon

their title. Bryant Heatley and wife, the latter coming in as intervener, impleaded W. H. Green, purchaser of the vendor's lien note given by Pat Frazier to Bryant Heatley for a part of the purchase price of the land, sought by cross-action to have their deed to Frazier reformed as against Frazier and Green so as to have same show a reservation, among other things, of mineral rights in the land and water rights therein alleged to have been severed by the judgment in partition based upon the commissioners' recommendations hereinbefore set out.

When the taking of the testimony was finished, all parties except Bryant Heatley and wife agreed that there were no issues of fact to be submitted to the jury in the main case. As to the cross-action of Bryant Heatley and wife for the reformation of the deed, the court peremptorily instructed the jury to return a verdict in favor of the plaintiff Pat Frazier and the defendant W. H. Green.

The trial court concluded that the contract of October 17, 1924, vested in Clark & Johnson "an interest in the real estate, upon which said tank or lake is situated, and that all right, title and interest therein mentioned as being conferred upon the said Clark & Johnson were not thereafter capable of being disposed of by the will of A. J. Jones," and that such rights were not revoked or otherwise affected by the death of A. J. Jones, for which reason it was further the conclusion of the court that plaintiff Frazier, having knowledge, both actual and constructive, of the Clark & Johnson contract, which had been duly recorded in the deed records of Stephens county, was not entitled to recover as against Clark & Johnson. The judgment of the trial court was based upon the further conclusion that plaintiff's suit was a collateral attack upon the judgment in the partition suit, and that the latter was valid and binding, for which reason also the plaintiff was not entitled to recover, save as succeeding to the interest of Bryant Heatley (i e. ⅗₀ of one-half) in the distribution of the proceeds from the sale of water as made and recognized in the partition judgment.

In the main suit the court rendered judgment for plaintiff Pat Frazier for the title and possession of the surface of said land and for all costs of suit. It further awarded to Pat Frazier a recovery against the defendant Hanlon Gasoline Company for ⅗₀ of one-half of the money held by it and ⅗₀ of one-half of all rents and revenues thereafter to be derived from the sale of water from said lake under said Clark & Johnson contract. The plaintiff Pat Frazier was denied all other relief asked by him. Clark & Johnson on their cross-action were awarded judgment against Hanlon Gasoline Company for one-half of the proceeds of water sales held

by it, and they were awarded judgment against the plaintiff and all other defendants for the continuing right and privilege of entering on said land for the purpose of looking after the lake situated thereon, and also the exclusive right and privilege of making contracts for the sale of water from said lake, and of collecting all proceeds of such sales and appropriating for their own use one-half of the same, as per the terms of the contract with A. J. Jones of date October 17, 1924.

G. P. Jones, individually and as executor and trustee of the estate of A. J. Jones, was awarded a verdict against Hanlon Gasoline Company for ⁸⁷⁄₉₀ of one-half of the money held by it, and the right to receive ⁸⁷⁄₉₀ of one-half of any and all sums of money that might thereafter be realized from the sale of water from said lake.

The plaintiff Frazier, interveners Bryant and Myrtle Heatley, and all of the defendants other than Chas H. Clark and T. Edgar Johnson and W. H. Green, excepted to the judgment and gave notice of appeal and have perfected their several appeals, thus most of them occupying the dual position of appellants and appellees.

This is a rather complicated lawsuit. Each of the litigants have filed interesting and exhaustive briefs which contain a great number of assignments and propositions. It would be impracticable and serve no useful purpose to mention and discuss each proposition specifically, but the conclusions which we shall announce will, it is believed, definitely indicate the propositions sustained, those overruled, and those rendered immaterial by such conclusions.

Upon the record we think it must be concluded that the revenues or proceeds to be derived from the sale of the water from the lake on and after November 1, 1924, as per the terms of the written contract of October 17th, 1924, vesting Clark & Johnson with one-half interest therein, were in the contemplation of the parties at the time of the execution of the contract, and such revenues had, under and by virtue of that instrument, such potential existence as to be the subject of assignment. The controverted questions are approached from this angle in order that, in the beginning, a clear conception may be gained of what A. J. Jones sold and conveyed to Clark & Johnson. The relevant facts are undisputed:

(1) Jones owned the land on which the artificial lake or reservoir was constructed, and necessarily owned the water.

(2) He owned the equipment and facilities on the land and used in connection with the tank in the transportation and sale of the water. That equipment consisted of the following: (a) A boiler used in pumping water from

the lake; (b) a Worthington steam pump, size 4½″x2¾″x4″; (c) the pumphouse, in size approximately 20′x24′, with galvanized iron roof; (d) the pipe known as the suction line, which runs from the pump to the water in the tank.

This equipment and facilities for selling water, along with the house, which is undoubtedly a part of the real estate, a permanent fixture on the land upon which the tank is constructed, A. J. Jones, by the contract of October 17, 1924, placed in charge, possession, and control of Clark & Johnson, and specifically stipulated in reference thereto as follows: "It is understood, and agreed the equipment on said tank is to remain there as long as revenue from the tank is a paying proposition, and for five months thereafter. After the expiration of five months, A. J. Jones will have the right to sell said equipment."

In addition to the other valuable considerations from Clark & Johnson to Jones for the grant and concessions evidenced by the original contract, that instrument embraced the following covenant, which will be requoted at this point: "As a further consideration of the party of the first part conveying to parties of the second part a one-half interest in the revenue that might be realized from the sale of water out of the above described tank, on and after November 1st, 1924, parties of the second part agree and obligate themselves to *look after said tank* and all contracts pertaining to the sale of water and deposit to the credit of A. J. Jones * * * one-half of all the revenues collected from the sale of water out of said tank, it being understood and agreed that the party of the first part will not have to worry about or bother with the collection of said revenue, *and parties of the second part are to use their best efforts to obtain out of said tank as great a revenue for the party of the first part as can be reasonably obtained*". (Italics ours.)

Being thus placed in charge by Jones during his lifetime, Clark & Johnson remained in control of the lake, discharging the duties incumbent upon them by virtue of the contract, guarding, looking after, repairing, and protecting the tank at their own expense, marketing the water, etc.

There is no evidence that A. J. Jones in his lifetime became dissatisfied with the manner in which Clark & Johnson met their obligations under the contract with him, and since, by their efforts, they increased the rents and revenues from the lake, it is but fair to presume that he was satisfied with their efforts. After his death, as stated, his estate was divided among his heirs, and in that proceeding his contract with Clark & Johnson and their rights and possession thereunder were fully recognized and respected (1) by the recommendations of the commissioners in partition; (2) by the confirmation of the court;

and (3) by the heirs, including Bryant Heatley, whose interest in the land on which the lake is situated was derived from such partition, and which interest he subsequently conveyed to Frazier.

In connection with the rights, facilities, and equipment respectively granted and delivered to Clark & Johnson, the nature and purpose of the contract will more readily appear when viewed in the light of the situation surrounding the parties and the subject-matter of the contract. That nature and purpose appears in this: The tank of water was situated in a proven oil and gas territory where there is and was, at the execution of the contract, a scarcity of water for which there was and has continued to be an actual demand. Further, there is no charge that Clark & Johnson had defaulted in any of the obligations assumed by them under the contract, and it appears that they are and have been able to effect a sale of the water from the tank, materially increasing the revenues therefrom. It will therefore be borne in mind that it was under the foregoing circumstances that the contract of October 17th was agreed upon by the contracting parties; hence the potential existence under the contract of the revenues aforesaid, which were in contemplation of the parties at the time of the making thereof.

In other words, that which Jones sold to Clark & Johnson had a potential existence, and it was therefore the proper subject of the contract. The rule as stated in 23 R. C. L. p. 1245, § 62, is: "Things have a potential existence which are the natural product or the expected increase of something already belonging to the seller."

In this connection the author further states: "Thus it has been held that the increase of profits to be derived from the holding of 'races' or 'fairs,' the property then improved and adapted to such purposes have such a potential existence as to render them the subject of a valid executed sale."

Under the subject of "Assignments," the same author (2 R. C. L. p. 587) says: "The potential interest of the seller is sufficient if he has a present interest in the property out of which the thing sold is the product, growth or increase."

Also, in 5 C. J. p. 854, § 16, it is said: "Thus, where the assignor has a present interest in that of which the thing assigned is the product, growth or increase, he has a present vested right to such future product, growth or increase when it shall come into existence, which right is assignable."

The above texts are supported by authorities therein cited. The applicability of the rule or principle of law to the facts of this case is apparent. A. J. Jones had something to sell and assign to Clark & Johnson. Being the owner of the land and the tank of water,

that of which the thing assigned was the product, as well as the house and equipment aforesaid, necessary and convenient in the sale and delivery of water, Jones could and did convey a valuable property right to Clark & Johnson, which remains in them, unaffected by Frazier's subsequent acquiescence, with notice of Heatley's interest in the 89.5 acres of land, as will be hereinafter further shown.

The fact that Clark & Johnson obligated themselves to look after the tank, constructed and adapted to the sale of water in a territory with a prevailing market therefor, and to make it produce a revenue and pay one-half thereof to Jones, is a significant fact, and has an important bearing on the potential existence of the subject-matter of this sales contract, as may be seen from the opinion in Christopher v. Davis (Tex. Civ. App.) 284 S. W. 253 (error refused), wherein it is held that assignments by lessee of a one-half interest in the net rentals to accrue from leases for a term of years, lessee binding himself and successors to protect leases from forfeiture and to sublet and collect rentals, were not void for uncertainty and contingency of interests, as they were expectancies or possibilities having potential existence. Other authorities to the same effect and supporting the general text above quoted are to be found cited in the last-named opinion. In support of the above proposition, we cite as additional authority: Richardson v. Washington, 88 Tex. 339, 31 S. W. 614; Koenig v. Rio Bravo Oil Co. (Tex. Civ. App.) 15 S.W.(2d) 93; Coca-Cola Bottling Co. v. Coca Cola Co. (D. C.) 269 F. 796, (10); Forsyth Mfg. Co. v. Castlen, 112 Ga. 199, 37 S. E. 487, 81 Am. St. Rep. 28, Notes, page 43; Low v. Pew, 108 Mass. 349, 11 Am. Rep. 357.

The preceding reasons and authorities cited furnish ample basis for the affirmance of the judgment, with slight modification, in so far is the rights of Clark & Johnson are concerned, but there are other and perhaps more substantial reasons for such an order.

By the contract of October 17, 1924, A. J. Jones not only placed Clark & Johnson in control of the lake, charged with the duty and obligation to look after the same and market the water to the best advantage, but he bound himself, along with other covenants, that the equipment, consisting of the house and pumping facilities, should remain on the land (tank), as long as revenue from the tank was a paying proposition, and for five months thereafter. Only at the expiration of such time was Jones himself at liberty or privileged to sell the equipment, and not sooner, and his death did not revoke the authority and right in Clark & Johnson, as set forth in the agreement.

We think it too clear for argument that A. J. Jones in his lifetime impressed this land or the lake of water with a servitude in favor of Clark & Johnson, and for his own benefit, as well as theirs. In Ritger v. Parker, 8 Cush. (Mass.) 145, 54 Am. Dec. 744, it is said: "Servitude" means the same as "easement" and "is a right, which one proprietor has to some profit, benefit, or beneficial use, out of, in or over the estate of another proprietor."

The rights acquired by Clark & Johnson may be regarded with more exactness as a profit a prendre in the land and lake owned originally by the deceased Jones. The nature of such right, as defined and illustrated in 19 Corpus Juris, p. 870, § 10, is as follows:

"The right to profits, denominated profits a prendre, consists of a right to take a part of the soil or produce of the land, in which there is a supposable value. The fact that this right is considered an interest or an estate in the land itself is the principal feature which distinguishes it from a pure easement, which is a right or interest without profit in the land. * * *

"The right to enter upon another's land and take water for domestic purposes from any natural fountain is not a profit a prendre, but merely an easement. On the other hand, the right to water artificially produced, as by means of cisterns or wells, would seem to be an interest in the land or a right to the profit a prendre."

In the case of T. & P. Ry. Co. v. Burrett, 57 Tex. 48, the court, in discussing the authority of the husband to grant a perpetual easement in land, the separate property of the wife, held that an instrument granting a railroad company a right of way, together with the right to take water, etc., from the land, created an estate of greater dignity than an easement. That court said: "The right attempted to be conveyed is, however, more than an easement in the legal acceptation of that term; in addition to granting a mere easement, it attempts to give the right to take something out of and from the soil, which is known in the books as a profit a prendre—a right coupled with a profit."

The construction and effect of the instrument here under consideration is very fully determined by our courts in construing similar contracts creating profits a prendre in the following cases: Graham v. Omar Gasoline Co. (Tex. Civ. App.) 253 S. W. 896; American Refining Co. v. Tidal Western Oil Corp. (Tex. Civ. App.) 264 S. W. 335 (error refused); Southwest Pipe Line Co. v. Empire Gas Co. (C. C. A.) 33 F.(2d) 248, 64 A. L. R. 1229. See, also, 27 R. C. L. p. 1236, § 145; Pomeroy's Jurisprudence (2d Ed.), § 689, p. 959; 41 A. L. R. page 1366.

In passing from this phase of the case it is proper to state that we have duly considered the contention of appellees Clark & Johnson that there was, by the contract of October 17,

1924, conveyed to them an interest in real estate; the contention being based upon that line of authorities that hold that a grant or devise of rents and profits or of the income of land passes the land itself, both at law and in equity, in the absence of anything in the context indicating contrary intention, and that such a grant or devise of one-half of the proceeds or other definite amount thereof would likewise pass title to the real estate to such an extent. Among the authorities cited, and to the above effect, are the following, based, respectively, upon grants by deeds and devises: Grants—Drusadow v. Wilde, 63 Pa. 170; Weakland et al. v. Cunningham (Pa.) 7 A. 148; Ball v. Hancock's Adm'r, 82 Ky. 107; Nisbet v. Dozier, 204 Ky. 204, 263 S. W. 736; Dembitz on Land Titles, vol. 1, pp. 105–110; Thompson on Real Property, vol. 1, p. 230, § 246; 3 R. C. L. Supplement 2, p. 1231, § 31; 28 C. J. p. 847, § 18. Cases involving bequests—Gidley v. Lovenberg, 35 Tex. Civ. App. 203, 79 S. W. 831 (error refused); Hunt v. Williams, 126 Ind. 493, 26 N. E. 177; Green v. Biddle, 8 Wheat. 76, 5 L. Ed. 547; 40 Cyc. under "Wills," p. 1536, § 3; 28 R. C. L. p. 239, § 203.

The authorities cited afford some support for the proposition here adverted to, but our decision is based more specifically upon the grounds first stated above.

This brings us to a consideration of the question of collateral attack made in the trial of this case on the judgment in the partition suit, No. 7211, district court of Stephens county. As will be seen, the court, in ordering the partition of the Jones estate, directed that the surface alone of the Stephens county lands be divided among the heirs, and that "all minerals and mineral rights in or under said Stephens County lands, and all the rentals, royalties and income derived from such minerals or mineral rights shall be, as to such lands located in Stephens County, Texas, left out of consideration by said commissioners in making their partition and division of said lands." In obedience to this order, the commissioners partitioned the property and in their report called attention to the sale and use of certain waters on the Stephens county land, evidently referring to the tank in question, and the Clark & Johnson contract, and recommended that the proceeds be paid into the common funds of the A. J. Jones estate, to be divided among the interested parties in proportion to their respective interests, and recommended that proper rights of way be continued and allowed over the lands for the purpose of promoting such sales, etc.

Proper conveyances of the respective parcels of land were made, and the trial court, respecting and approving the recommendations of the commissioners, confirmed their report as "fairly and equitably made, according to law and the order of this court."

It is claimed by the appellant Frazier that the court's disposition of the water rights in the above judgment is void, and therefore subject to collateral attack, that, such being the necessary effect of the judgment, Bryant Heatley acquired complete title to the surface of the land, inclusive of the water rights, and that he (Frazier) by purchase succeeded to the rights of Heatley as against the Jones heirs, as well as the claims of Clark & Johnson under their contract of October 17, 1924. These contentions he would sustain by a series of propositions, thus eliminating that particular phase of the judgment. Also, by the application of certain rules of construction, the remainder of the judgment would be permitted to stand, passing title to the water rights first to Heatley as against the other heirs and then to him (Frazier) by the deed of Heatley and wife.

■■ Of course, a void order or judgment is subject to collateral attack, but we do not consider the judgment in the respect here under consideration void. It was not appealed from. It was rendered by a court of general jurisdiction and having jurisdiction of the parties and the subject-matter. In Barkley v. Stone (Tex. Civ. App.) 195 S. W. 925, 926, in discussing the authority of the district court in partition proceedings under article 6086, R. S., it is said: "The effect and purpose of the statute, it occurs to us, is to confer upon the trial court authority to adjust and enforce between cotenants every conceivable equity relating to the parties and the property."

■ The district court, in partitioning the Jones estate, had the power to proceed, either under equitable rules governing such a proceeding, or under statutory provisions regulating the same, and we think it had authority to blend the two, if in doing so such a procedure enabled it to make a fair and equitable distribution of the estate among those entitled to the same.

Our Supreme Court in Moore v. Blagge, 91 Tex. 151, 38 S. W. 979, 41 S. W. 465, has held that a trial court could disregard the allegations in a partition and adopt a course which, in partitioning the property, would be to the best interest of all parties concerned. The court in the instant case appears to have done nothing more, and, the judgment of confirmation and approval of the commissioners being unappealed from, we think no part of that judgment can be eliminated by this attack.

In Sherwood et al. v. Kelly (Tex. Civ. App.) 257 S. W. 278, it is held that the remedy of a party to a partition suit to irregularities in the partition sale is by timely calling them into question by appeal from the court's ruling on proper motion made and filed in that court, or by a bill of review for cause to set the sale aside in the same proceeding and not in an independent suit.

Recurring to Frazier's contention that he is but construing the judgment and rejecting a part thereof as void, we are of the opinion that such contentions cannot be given the effect claimed for them. Frazier is but the assignee of the interest in the 89.5 acres owned by Heatley, to whom it was awarded upon the basis of $7 per acre surface value. When Heatley was awarded the property, he knew the sales from the water in the tank were producing an income of $500 per month, or $6,000 per year, an amount in excess of the appraised value of the entire partition of the Jones estate awarded Heatley, whose entire share was valued at $5,618.65. These facts were known to Frazier at the time he purchased the property from Heatley and paid the sum of $12.50 per acre therefor. By this suit he seeks to reject certain portions of the above judgment and to so construe the portions remaining so as to trim away certain essential provisions thereof, and by so doing demonstrate that Heatley, by the partition proceeding, became the owner of the surface, together with the mineral and water privileges, and that these were in turn conveyed to him by Heatley and wife in the conveyance of the 89.5 acres of land.

However, in this contest Frazier stands in the shoes of Bryant Heatley, and he will not be permitted to assail the judgment in partition in any manner not countenanced by law and equity, were the assault being made by Heatley. Heatley as plaintiff invoked the jurisdiction of the court in that suit and secured a judgment, from which he prosecuted no appeal. Neither did the other heirs. The judgment was satisfactory to him, and, under such circumstances as to Heatley and his assignee Frazier, with notice, they are each estopped to attack the judgment collaterally. As said in Freeman on Judgments (5th Ed.) vol. 1, p. 640, § 320: "Even where the circumstances are such as might otherwise afford sufficient grounds for successful attack collaterally upon a judgment or decree, the conduct of a party may be such as to estop him from availing himself of those grounds. The general rule has been laid down and is supported by numerous decisions, that a party at whose instance a judgment was rendered is not entitled in a collateral proceeding to contend that the judgment is invalid. * * * The same principle is applied as against a person who seeks to vacate the judgment or obtain equitable relief against it."

Upon the proposition of ratification of the judgment, we take from 47 C. J. p. 433, § 414, the following: "Pursuant to the general rule a judgment in a partition suit may be ratified by the acts of the parties whose interests are thereby adjudicated. A person electing to take under a partition ratifies the entire decree; he cannot ratify the beneficial part and repudiate the disadvantageous part; he may not hold his lands and be relieved from the burdens imposed thereon by the decree; and when he takes the part allotted to him, he is estopped to question the title to the portions allotted to the other parties."

The rule is not differently stated in 10 R. C. L. p. 681, § 10: "A person cannot claim under an instrument without confirming it. He must found his claim on the whole, and cannot adopt that feature or operation which makes in his favor, and at the same time repudiate or contradict another which is counter or adverse to it."

The rule as stated is certainly applicable to the situation before us. The judgment in the partition suit is clear and unambiguous. It severed the water rights in the particulars under consideration, as well as the minerals, from the surface of the estate in the lands in Stephens county. It is quite clear that the parties so construed the judgment, and it is equally as clear that the court so intended. The contemporaneous construction given the judgment by the parties may not be disregarded without working an injustice. In 47 C. J. p. 431, § 411, it is said: "General rules as to the construction and interpretation of decrees and judgments apply. A partition by decree of court is the act of the court, and its intention governs. Acts of the parties evidencing a contemporary construction may be considered."

The text cites numerous authorities supporting each of the above propositions, and in support of the last, Rosenthal v. Sun Co., 156 S. W. 153 (Tex. Civ. App.), and Barnett v. Mahon, 31 S. W. 329 (Tex. Civ. App.).

It thus appears that, if Heatley was the owner of the tract of land at this time, he could not urge the contentions advanced by Frazier, and Frazier, purchasing from him, with notice of the foregoing facts and circumstances, cannot be heard to urge such contentions. True, he has a warranty deed from Heatley, but the judgment in the partition suit is a link in his title. He necessarily takes under that judgment, as did Heatley, and he cannot be heard to ratify and accept the beneficial part of the decree and repudiate the disadvantageous part. He cannot take the surface and be relieved from the burden imposed thereon by the decree, and especially is this so since he has actual and constructive notice of the interest of Heatley in the land conveyed him under that judgment.

Further, Heatley being an adult heir of Jones, he had the power and the right to agree to a partition of the estate upon the very terms and conditions specified in the judgment. He evidently did so. Thus, by decree of the court and by the authority of personal consent, that judgment became a written

muniment of title of that which he received from the estate, and which he conveyed to Frazier.

 Further, having accepted the judgment, it may be regarded as an agreed judgment, so far as he is concerned, and in that character of case, as said in M., K. & T. Ry. Co. v. State (Tex. Civ. App.) 275 S. W. 673, 679, the judgment should be interpreted as a contract between the parties and the entire instrument construed in the light of the whole and the surrounding circumstances. This authority is one in which the court was construing the effect of an agreed judgment relied upon by the railway company as a necessary link in its chain of title, analogous to the situation of Frazier and the title obtained by him from Heatley. The railway company sought to relieve itself of certain burdens in the agreed judgment, and the court, in discussing the question of estoppel there arising, used this language: "Appellant by its purchase at judicial sale gained no greater title than the agreement and judgment passed to its predecessors. It accepted this title with all the benefits annexed and appurtenant, and surely fairness and equity will make it perform the obligations annexed and appurtenant thereto."

In that same connection, the court, in that opinion, quotes from Whitney v. Union Ry. Co., 11 Gray (Mass.) 359, 71 Am. Dec. 715, as follows: "To what extent and in what cases are such stipulations binding on those who take the estate under the grantee, directly or by a derivative title? Upon this point, the better opinion would seem to be that such agreements are valid, and capable of being enforced in equity against all those who take the estate with notice of them, although they may not be strictly speaking real covenants, so as to run with the land, or of a nature to create a technical qualification of the title conveyed by the deed. * * * In this view, the precise form or nature of the covenant or agreement is quite immaterial. It is not essential that it should run with the land. A personal covenant or agreement will be held valid and binding in equity on a purchaser taking the estate with notice. It is not binding on him merely because he stands as an assignee of the party who made the agreement, but because he has taken the estate with notice of a valid agreement concerning it, which he cannot equitably refuse to perform"—citing numerous authorities.

Other authorities are cited in the case of M., K. & T. Ry. Co. v. State, which support our conclusions here, and attention is particularly directed to the opinion in Parker v. Nightingale, 6 Allen (Mass.) 341, 83 Am. Dec. 632. To these and the authorities referred to we add Gale v. Tuolumne County Water Co., 169 Cal. 46, 145 P. 532, in which it is held that a judgment is conclusive between the parties and their successors in interest by title subsequent to the judgment, and that a successor in interest of the original defendant in suit involving water rights is bound by the judgment rendered prior to the transfer of the interest.

Under the subject of "Partition," 47 C. J. p. 277, § 30, the rule as to ratification and estoppel in such cases, and the extent to which privities under a judgment are bound, is stated thus: "Although a partition is for some reason voidable, it becomes valid and binding by the ratification and acquiescence therein of all of the persons interested in the property involved. So also they may by their acts or omissions estop themselves to deny the validity of the partition, although there may be no technical estoppel by record or any written conveyance, and under the general rule privies as well as the parties themselves may be bound by the estoppel." See Urban v. Bagby (Tex. Civ. App.) 286 S. W. 519; Id. (Tex. Com. App.) 291 S. W. 537.

So, as heretofore indicated, we conclude that Frazier is bound by the judgment partitioning the Jones estate and is limited in his ownership, as was Heatley, to the surface alone in the 89.5 acres of land, subject to the water rights reserved and severed by that judgment and owned by the Jones estate, burdened with the rights conveyed by the deceased, Jones, in his lifetime to Clark & Johnson. The authorities cited above, and especially M., K. & T. Ry. Co. v. State, are pertinent upon the contentions made by Clark & Johnson, and that authority and those therein cited clearly indicate that we have given the correct legal effect to the contract between them and Jones, deceased.

 In the first partition judgment the court decreed that the surface only of the land in Stephens county be partitioned, and that no partition be made of the mineral rights. That judgment decreed Bryant Heatley's interest in the estate to be 3/90 of the entire residue of the estate. The second judgment in partition expressly partitioned only the surface, leaving the mineral and water rights unpartitioned. This, as we have shown, effected a severance of these elements. This latter judgment recites that it is in accordance with the previous order and judgment of the court directing partition of the estate. Frazier's suit is based upon the contention that the last recital in the judgment of confirmation is not true and that the latter judgment does not conform with the former judgment. If, in fact, a proper construction of the latter judgment is that it does not conform to the former, that merely evidences that the court rendering it was mistaken as to the law. Evidently the court construed the former judgment as authority for failing or omitting to partition the water rights as well as the oil and gas rights. If in

this view the court was in error as to the existence of such authority in the premises, it must be conceded that a judgment erroneous as to law is no more subject to collateral attack than one that is erroneous as to a matter of fact. As said in 15 R. C. L. p. 861, § 335: "The general rule is that an error of law does not furnish ground for collateral attack on a judgment. * * * Whenever a court is confronted with a question which it has a right to decide, its erroneous judgment will not be subject to a collateral attack, irrespective of whether the mistake of law concerned the common statutory or constitutional law. A judgment is binding upon the parties although it is undoubtedly erroneous under the law, as subsequently declared by the courts." That is, the power to render a judgment carries with it the power to render an incorrect one, but the error cannot be attacked collaterally. These principles find application here.

Further, if the effect of Frazier's contentions is that, in so far as the second judgment in partition fails to correspond with the first judgment, no property rights were created, then this theory, if applied to his situation in this suit, refutes his contentions that Bryant Heatley, under the second judgment, obtained the exclusive water rights in the lake along with the surface of the 89.5 acres of land. It refutes it in this: The first judgment decreed Heatley's interest in the entire estate to be $\frac{3}{90}$ of the residue thereof. The commissioners in partition valued the lands awarded to Heatley in the second decree at $\frac{3}{90}$ of such residue *exclusive of the water rights here involved*.

Now, to construe the second decree, as contended by Frazier, as awarding to Heatley $\frac{3}{90}$ plus the valuable water rights here involved, and producing $6,000 per year, a sum in excess of the value placed by the commissioners on the entire interest awarded Heatley in the Jones estate, is to construe the second decree as awarding Heatley a much greater interest than a $\frac{3}{90}$ interest, as was intended by each decree of the court. Under the facts of this cause this water right produced more revenue in one year than the entire value placed upon the $\frac{3}{90}$ of the estate to which Heatley was legally entitled.

Bryant Heatley having made a warranty deed to the 89.5 acres of land, it may, in the future, carry to Frazier all additional rights and interests, if any, hereafter acquired by Heatley in the partition of the minerals and water severed by said judgment. Therein lies a possible and prospective injustice under the present judgment denying Heatley the reformation sought in the said deed, if, on the facts he be entitled to such. His pleadings seeking such reformation are not all that is desirable under the law in such cases, since they almost bear the construction that he sought to except 15 acres of land from the conveyance rather than the establishment of a reservation of the lake waters, with a right to use the surface to a certain extent for storage purposes. However, it would probably be too severe a construction of his pleadings to condemn them as a basis for the relief prayed for, and, adopting a liberal view of the pleadings, we conclude that the court erred in instructing a verdict against Heatley on his plea for reformation. On another trial the pleadings will doubtless be made to conform more nearly to the exact recovery sought.

■ In passing upon a motion for an instructed verdict the court cannot weigh the evidence, but is bound to consider to be true all evidence which supports the view of the losing party, and it must give him the benefit of all legitimate inferences which are to be drawn therefrom in his favor. It is the rule that the court must give the evidence its strongest probative force. Clutter v. Wisconsin Texas Oil Co. (Tex. Civ. App.) 233 S. W. 322 (error refused).

With this rule in mind we have reviewed the testimony, and we think it was sufficient upon the issues made to carry the same to the jury.

' ■ The fact that Heatley received from Frazier a vendor's lien note in part payment for the conveyance and thereafter transferred the note to W. H. Green for a valuable consideration, if he did, would not be an obstacle to a reformation of the warranty deed as between the grantors Heatleys and Frazier, if upon the facts Heatley showed himself entitled to such relief. If, as appears to be the case, Green establishes that he purchased the note without notice of alleged equities between Heatley and Frazier, the court could and should enter such order and decree as would protect unimpaired the security which Green now has for the payment of the notes to him. If Heatley establishes the facts upon which he relies for reformation of the deed, his transfer of the note prior to the discovery of the alleged mutual mistake would not bar relief against the purchaser of the land; it being practicable for the court, by decree, to protect the defendant Green against the loss of his security. Romine v. Howard (Tex. Civ. App.) 93 S. W. 690, 692 (writ refused). In this authority it is said: "Wherever in a suit of this character, especially in land cases, the case is such as to admit of the court's adjusting and protecting the equities of the defendant without a tender of money by the plaintiff, such a tender is not essential."

Under the facts of the instant case it is not conceivable that it would be incumbent upon Heatley, if he establishes his contentions, to tender anything to Frazier, and, if Green be an innocent purchaser of the note, it should

by order of the court remain unimpaired in its security.

In the court's decree Pat Frazier was awarded recovery of a 3/90 interest (i. e. the interest of Bryant Heatley) in one-half of all the rents and revenues accumulated in the hands of the gasoline company and to be derived in the future from the sale of water from the lake, and accruing to the estate of A. J. Jones, deceased, under any contracts that might be made by Clark & Johnson. By assignments and correct propositions, this order of the court is challenged as being without basis in the testimony. We sustain the propositions.

This award was doubtless granted upon the theory that Frazier purchased Heatley's entire 3/90 interest in the Jones estate. The facts are: The tract purchased by Frazier, exclusive of the water rights, was but a small fraction of Heatley's 3/90 interest in the estate; he having been awarded several other tracts of land, as well as his proportional share of property sold as not being capable of partition. At most, therefore, Frazier would have been entitled to but a fractional part of this 3/90 interest, but, under the views above expressed, this water right had been severed, and Heatley's deed carried to Frazier no interest therein. However, in accordance with the views above expressed, this 3/90 interest in the one-half of all rents and revenues accumulated and to be derived in the future from the sale of the water from the lake should have been awarded to G. P. Jones, executor and trustee.

For the reasons assigned, the judgment of the trial court will be affirmed in part, reformed and affirmed in part, and reversed and remanded in part. It will be reformed in the following respects: Appellant Frazier is denied any recovery against Hanlon Gasoline Company; G. P. Jones, executor and trustee, et al. shall recover against the Hanlon Gasoline Company one-half of the rents and revenues accruing on account of the purchase of water instead of 87/90, as decreed. In so far as the judgment decrees a continuing right in Clark & Johnson to make sales of the water in said tank, the same is reformed so that such right will terminate five months after the revenues from the sale of water from the tank cease to be a paying proposition, as per the terms of the contract of October 17, 1924. On the cross-action of Bryant Heatley and wife, Myrtle Heatley, against Frazier and Green for reformation, the judgment of the trial court will be reversed and the cause remanded. In all other respects the judgment of the trial court is affirmed. It is so ordered.

FUNDERBURK, J. (dissenting).

Being unable to concur in the opinion and judgment of the majority, I will briefly express my views on the more important and controlling questions presented by the appeal.

Of first importance, I think, is the question of whether or not the contract of October 17, 1924, by which A. J. Jones undertook to grant some character of rights or interests to Clark & Johnson, conveyed to them an interest in the land upon which the tank was located. In the majority opinion it is held that the nature of the interest granted was a profit a prendre, an interest in land. A good definition of a contract is: "A promise or set of promises to which the law attaches legal obligation." Williston on Contracts, § 1. "The definition given at least makes clear that the obligation of a contractor is based on a promise made by him." Id. Under the definition, a contract evidences rights and obligations. Each party may have both rights and obligations. But, even so, the "rights" are not "obligations," nor are the obligations rights. In the contract in question, the obligations of Clark & Johnson consisted of promises. Those promises, or the obligations existing by reason thereof, must not be confounded with their rights. Aside from the provisions of the "Appendix," to be discussed later, the sole right which the contract gave to Clark & Johnson was the right to "one-half interest in whatever revenue that might be realized from the sale of water out of said tank." Since a profit a prendre includes an easement, and it is because of that fact that it is an interest in land, and, since an easement, as to one claiming it, is a "right," it follows that the contract does not grant a profit a prendre unless the provisions of the "Appendix" do so. This statement is based upon the assumption that no one will contend that the right to one-half the revenues that might be derived from the sale of water out of said tank in itself includes an easement in the land. Water artificially impounded, as was this, is, I think, personal property. "By a conveyance of water, the land under the water does not usually pass, the proper description being of the land as covered by water." Tiffany on Real Property, p. 1647. Water which, under certain conditions, is not the subject of private ownership, is, according to the same authority, property when taken into possession by placing it in a reservoir or other receptacle. In that case it is said: "Water thus privately owned has been regarded as personal property." Id., p. 1131. It seems to me that the rule for determining whether manure is real or personal property may be applied to determine whether water is real or personal property. That rule is: "Manure in a heap is a chattel, and goes to the executor, while, if it lies scattered on the ground, it is parcel of the freehold." Id. p. 949. By just analogy, percolating waters or waters in their natural state in and upon the land may be regarded as a part of the land, but when artificially impounded in a reservoir or tank should, I think, be regarded as

personal property. But the contract did not purport to grant to Clark & Johnson an interest in the water. Even if the water was part of the land, they acquired no interest in the land by a grant of an interest in one-half the revenues derived from the sale of water. A fair test of the question would be whether the contract was one required to be in writing under the statute of frauds. It is well settled that a promise or contract by one person to pay another a certain sum of money out of, or a certain share of the proceeds of a contemplated sale of land, or an interest therein, is not within the statute. 27 C. J. 226; Lincoln v. Kirk (Tex. Civ. App.) 243 S. W. 671; Martin v. Morrison (Tex. Civ. App.) 260 S. W. 893.

I cannot agree that there is any question of possession or right of possession, or right of use of the land in the nature of a servitude or easement involved. The possession, if the contract deals with that matter, was that of Jones, the owner, through Clark & Johnson, his employees. The provisions which seem to be construed as showing rights in Clark & Johnson in the nature of a servitude or easement are, on the contrary, obligations and burdens, constituting expressly the consideration moving from them for the right above mentioned.

By the "Appendix" to the contract, Jones obligated himself not to remove the equipment from the tank, nor to sell same, "as long as revenue from the tank is a paying proposition, and for five months thereafter." That obligation gave to Clark & Johnson the correlative right to have the equipment so remain and not be sold. Does that alone evidence the conveyance of an interest in land? The contract does not state what the equipment was. Whatever it was, it was something which the parties contemplated might be sold. Is it probable that they would, in their contract, make no provision restricting the sale of the land, and yet make the one they did as to the equipment, unless they regarded the latter as something separate from the land? If the equipment was personal property, of course the provision cannot be held to effect the conveyance of an interest in land. The same test is applicable here as to whether the contract is one required to be in writing under the statute of frauds. "A contract, though oral, that land shall be used or shall not be used in a particular way, is enforceable unless the contract, if enforced, would give rise to a legal or equitable easement." Williston on Contracts, § 493. "The agreement not to use his mill, after a certain day, is not within the statute of frauds and perjuries, for this statute contemplates only a transfer of lands, or some interest in them." Bostwick v. Leach, 3 Day (Conn.) 476; Hall v. Solomon, 61 Conn. 476, 23 A. 876, 29 Am. St. Rep. 220. I am unable to appreciate the point that the contract provided for any restriction in the use of the land such as that the performance of the contract would give rise to a legal or equitable easement. The equipment was merely to remain where it was. Surely it cannot be said, as a matter of law, that that was a restriction upon the use of the land. The restriction against sale, as already said, could not have reference to a sale of land. It is unreasonable, I think, to ascribe to the parties an intent by such provision to restrict any sale of the land when, if such had been the intent it was so easy, and the natural thing, to plainly say so.

Another reason that seems to me to compel the holding that the contract conveyed no interest in land is the conclusion hereafter to be discussed, that the contract was invalid and unenforceable because of indefiniteness, save and except to the extent it was made definite by the actual sale of water or provisions for such actual sale. If the contract was unenforceable prospectively, then the time that the "revenue from the tank is a paying proposition" was, from the very first, too uncertain and indefinite to fix any term of the grant of an interest in land. If it was intended to convey an interest in the land, it is certain that it was not to be unlimited in duration. There would have to be some certainty of duration for any interest to be sufficiently defined.

The question last adverted to will next be considered. The contract, by its terms, grants "one-half interest in whatever revenue that might be realized from the sale of water out of said tank." No obligation is imposed upon the owner of the tank to sell water. No restriction appears to be imposed upon the owner to make other and different uses of the water. Were we to attempt to imply an obligation to sell water, we would be met with the difficulty of indefiniteness and uncertainty as to how much water should be sold. It would be unreasonable, I think, to undertake to imply a duty to sell water that would restrict and limit the otherwise existing right of the owner to use water to irrigate his lands or to make other proper uses thereof. Apparently Clark & Johnson relied upon the self-interest of Jones to sell water, content to have their rights and interests conditioned or contingent upon such sales being made. Their rights were therefore not materially unlike those of one who makes or assigns an oil or gas lease for a consideration to be paid in oil produced from the land without imposing drilling obligations on the lessee or assignee. Harris v. Wheeler (Tex. Com. App.) 267 S. W. 465; Cotherman v. Oriental Oil Co. (Tex. Civ. App.) 272 S. W. 616; Ferguson v. Mansfield, 114 Tex. 112, 263 S. W. 900; Ferris v. Huffman (Tex. Com. App.) 274 S. W. 125; Great Western Oil Co. v. Carpenter, 43 Tex. Civ. App. 229, 95 S. W. 57.

The contract, because of indefiniteness, was never enforceable, so far as it was executory, but, to the extent it was performed by actual

sales, no reason appears why it was not enforceable. Williston on Contracts, § 49. I am of opinion that, as to all revenues that the contract of May 1, 1925, to which Hanlon Gasoline Company succeeded, secured to the parties, the rights of Clark & Johnson to one-half thereof became enforceable. The last-named contract itself, expressly recognizing Jones as the owner of the land, conveyed an interest in the land to Hanlon Gasoline Company, which, being such, survived the death of A. J. Jones, and continued by its terms until May 1, 1927. The contract with Clark & Johnson would not, I think, have continued as an enforceable obligation after the death of Jones, but for the last-named fact. Their rights before Jones' death had become fixed and operative to one-half of all the revenues from the sale of water taken under the contract with Hanlon Gasoline Company. The last-named contract simply supplied a definite subject-matter, upon which the otherwise indefinite contract of Clark & Johnson could operate.

As thus fixed and operative, it was none the less only an interest in the revenue from the sale of water; neither the amount of which nor means of ascertaining such amount was fixed by the contract. For aught the contract provides to the contrary, ownership of all the water without restriction as to his right to use same for other purposes than for sale remained in Jones, the owner. As already pointed out, he was in no manner restricted in his use of the water.

The next question is: What is the effect of the judgment in the partition suit? The first judgment of July 13, 1926, decreeing the interest of all the several owners of all the land under the will of A. J. Jones, made no mention of the interest therein in the nature of an easement held by Hanlon Gasoline Company. Neither did it mention the contract of Clark & Johnson. I think, therefore, that that judgment did not affect such easement or contract. Since the easement expired on May 1, 1927, thereafter, the operation of the judgment thereafter being precisely as though no such easement ever existed, it is unnecessary to examine into the question of whether the judgment was invalid because it took no account of the easement and the owner thereof. It is sufficient to say that, if it were defective for that reason, it is not a matter to be urged upon a collateral attack. As to the contract, it ceased to operate with the expiration of the easement, because, as already said, there was no longer any subject-matter so defined as to make it operative.

The judgment of July 13, 1926, having fixed the interests of the several parties, and ordered partition in accordance therewith, the power of the commissioners to make partition, and the power of the court at a subsequent term to approve the report and order the vesting of title in severalty, were, I think, definitely prescribed and limited by the terms of the first judgment. White v. Mitchell, 60 Tex. 164; Arnold v. Cauble, 49 Tex. 527. The entire foundation for the second decree was the first decree. Scheiner v. Proband, 73 Tex. 532, 11 S. W. 538; White v. Mitchell, supra.

In my opinion, the court was without power to adjudge the existence of easements and the right and power of Clark & Johnson to make contracts, etc., for the sale of water, or to collect the proceeds thereof. Such a matter was never addressed to the jurisdiction of the court by any character of pleadings. But, aside from the question of a lack of power in the court to adjudicate such matters, it is our duty to so construe the action of the court, if possible, as to acquit the court of any intent to do what it clearly had no power to do. In so far as the commissioners of partition reported that they had not undertaken to make any apportionment of the funds received, or to be received from the proceeds of the sale of water, they were but declaring they had not undertaken to do a thing which they had no power to do. Their recommendation and expression of intention "that such proceeds be paid into the general or common funds of the A. J. Jones estate, to be divided and distributed from time to time among all the parties interested in said estate," etc., could no more affect the partition of land they did make than a suggestion that any other fund or personal asset of the estate should be appropriated in a certain way. It simply means no more than that matter was expressly excluded from the partition as then being made. If not, nevertheless it should be held to refer to the sales made under the then existing contract and easement, and to have ended with the expiration of that easement. As to the recommendation "that proper rights-of-way and easements be continued and allowed from time to time, over, along and across any of the land owned by A. J. Jones in his lifetime, to permit and allow reasonable access to use of and transportation of said waters," two things may be said:

In the first place, at the time, there was one easement and only one, and that was not affected by the partition and could not be. The judgment based upon this recommendation should be construed as simply a recognition of same. The "time to time" should be held to refer to that easement as but a recognition of its continued existence, according to its terms. That construction would be entirely consistent with the intent of the court not to do anything it had no authority to do. Likewise it would affect no question involved in this suit.

In the second place, the provision, if not so construed, is wholly ineffectual to create an easement because of uncertainty and indefiniteness. To what lands does it apply? By its terms, to "any of the land owned by A. J.

Jones in his lifetime." It was not even confined to such lands as he owned at his death. What was the nature, extent, and duration of such easements? It is wholly unreasonable, it seems to me, that a possibly perpetual servitude can be held to have been placed upon a particular tract of land by any such designation and description. But, since the judgment otherwise carried out the mandate of the prior judgment, it is my opinion that the last-named judgment, with the exception noted, was valid, at least as against collateral attack.

I will but briefly dwell upon other questions. We will take, first, the question of the rights and liabilities of the Hanlon Gasoline Company as to water taken from the tank from May 1, 1927, the date of the expiration of its easement, up to June 1, 1928, the date it had notice that plaintiff Frazier was claiming inconsistent rights to all the water. When Hanlon Gasoline Company, after a reasonable time for taking away its equipment, continued to use water from the lake just as it had done theretofore, it became a trespasser or else a licensee. If the former, it is liable for the value of all the water taken as for a conversion. If the latter, its taking the water was justified, and in my opinion there exists no right of recovery by plaintiff against either Hanlon Gasoline Company or any one to whom it may have made payments for the water. The license, if it existed, was an implied one and not express. "A license to do certain acts on land may occasionally be inferred from the owner's failure to object to the doing of such acts thereon." 2 Tiffany, p. 1205. "No formality is necessary to a license. It may be * * * implied from the relations of the parties or from the conduct of the landowner as when he indicates an assent to the doing of certain acts on his land." Id. p. 1204. Says Corpus Juris: "When the owner of land, with full knowledge of the facts, tacitly permits another repeatedly to do acts upon the land, a license may be implied from his acquiescence or failure to object." 37 C. J. 283. "An ineffectual attempt to convey or lease land may operate as a license to enter and occupy until the lease is revoked." 37 C. J. 284.

Accordingly, it has been held that a parol sale of standing trees, although void as a sale of an interest in land, operates as a license to enter and cut and carry away the trees until revocation. Jenkins v. Lykes, 19 Fla. 148, 45 Am. Rep. 19; Spalding v. Archibald, 52 Mich. 365, 17 N. W. 940, 50 Am. Rep. 253.

The license excuses the licensee and exempts him from liability to the licensor for all acts done within the scope of the license prior to its revocation. The situation was that Frazier purchased the land on August 8, 1927, with knowledge that Hanlon Gasoline Company, with its equipment on the ground, was taking the water under a claim of right. He knew that a judgment to which his grantors were parties undertook to confirm in it an easement and right to take the water, ineffectual though it was. The taking of the water constituted no permanent injury to the freehold. If the water, aside from the contract, had the market value that it was agreed it had, there was no limitation or restriction on Frazier's right to sell it or make other use of it. With this situation existing, Frazier made no objection or gave any notice that he claimed any rights inconsistent with the rights asserted. Was the taking of the water by Hanlon Gasoline Company wrongful? If not, it cannot be held to the liabilities of a trespasser. I think the conclusion justified that it was protected as a licensee up to the time it received notice that amounted to a revocation. Its acts being not unlawful, and Frazier not being a party to the contract for the payment of water, I am further of opinion that Frazier has no just claim against any of the parties to whom the money was paid.

The license was subject to be terminated by revocation. It was revoked as of June 1, 1928, when he first gave notice of his claim. By such revocation the contract of Clark & Johnson became inoperative. The subject-matter of the contract was in a sense destroyed. The right to sell water was thereby terminated, and without such right there was no way to produce the revenues in which alone they had their interest. Thereafter, the Hanlon Gasoline Company protected itself by withholding the money in the sum of $5,500. I see no reason why, under the agreed facts, plaintiff should not recover the value of the water taken subsequent to June 1, 1928.

I am also of opinion that the trial court correctly instructed a verdict in favor of plaintiff and W. H. Green on the cross-action of Bryant Heatley and wife.

It is further my opinion that, by means of the implied license given by Frazier to Hanlon Gasoline Company after May 1, 1927, the contract of Clark & Johnson was rendered operative and enforceable as between them and the heirs and devisees of A. J. Jones as to all revenues paid them under the terms of that contract, and that therefore the trial court did not err in denying recovery to the executor and trustee and the devisees upon their cross-action against Clark & Johnson.

I am also of opinion that the judgment of the trial court, in so far as it awarded to plaintiff Pat Frazier recovery for the title and possession of the surface of said land, and in so far as it denied recovery in favor of Bryant Heatley and wife against plaintiff and W. H. Green on the cross-action for reformation of the deed, should be affirmed. In so far as said judgment awarded to Pat Fra-

476

zier recovery of 1/30th of 1/2 of the money held by Hanlon Gasoline Company, it should be reformed, and, as so reformed, be affirmed. In so far as said judgment awards recovery in favor of Clark & Johnson against Hanlon Gasoline Company, and in so far as it awards recovery in favor of G. P. Jones, individually and as executor and trustee, and the other parties joined with him in their cross-action against Hanlon Gasoline Company, should be reversed and rendered in favor of Hanlon Gasoline Company.

## On Rehearing.

LESLIE, J.

In the motion of Clark & Johnson for rehearing, it is presented that we erred in failing to hold that the period of time during which their rights in the water from the lake in question shall exist is tolled by the pendency of this suit. That question is not before us in the present record, and we do not think it would be proper to express an opinion thereon.

In appellant Pat Frazier's motion for rehearing, it is pointed out that, under our holding, Bryant Heatley owns no interest in the minerals or water rights, and, for that reason, a reformation would be useless and of no effect. As stated in our original opinion, the only effect of a reformation would be to relieve Heatley from the binding effect of his warranty in the event he should later acquire these mineral and water rights. Both parties agreed that it was not their intention to sell Frazier the mineral rights, and the pleading is certainly sufficient for a reformation as to the minerals.

All of the motions for rehearing have been considered, but are overruled.

FUNDERBURK, J., dissents for the reasons stated in his opinion heretofore filed.