## HUMBLE OIL & REFINING CO. v. JEFFREY et al.

### No. 7572.

Court of Civil Appeals of Texas. Austin.
April 1, 1931.

Rehearing Denied April 15, 1931.

Webb & Felts and Edwin G. Moorhead, all of Austin, and R. E. Seagler, of Houston, for appellant.

Page & Powell and Maynard & Maynard, all of Bastrop, and Black & Graves, of Austin, for appellees.

BLAIR, J.

Appellant, Humble Oil & Refining Company, sued appellees, Wm. F. Jeffrey, T. A. Tiller, Dave G. Tiller, M. C. Kelley, Burt Brydson, Rastus Johnson, Helen Trulove, and C. W. Robinson, in trespass to try title to seven-eighths of the oil, gas, and other minerals in 32.23 acres of land in Bastrop county. Wash Franklin, deceased, was the agreed common source of title, and appellant claimed seven-eighths of the minerals under an ordinary 88 form oil and gas lease executed to it by Rebecca Franklin, the alleged common-law wife of Wash Franklin, and their children, Helen, Emzie, and Wayman Franklin, and Savannah White, joined by her husband, Tom White, and Lee A. Duke also signed the lease, which was dated April 16, 1929. Appellee Jeffrey answered by a general denial, a plea of not guilty, pleas of the three and five year statutes of limitation, pleas of res adjudicata and estoppel by a certain judgment rendered July 16, 1929, by the district court of Bastrop county, against Rebecca Franklin and her above-named children, in favor of Burt Brydson, Jeffrey's predeces-

sor in title, for the fee-simple title to the land in controversy; and by an alternative plea that, after Brydson obtained the entire interests of Rebecca Franklin and her children, appellant's lease terminated by its own terms for failure to pay the annual rental to Brydson, or to his successors in title. Jeffrey also filed a cross-action against his co-defendant Johnson. Brydson and Johnson did not answer. The remaining appellees, who purchased mineral royalties in the land in controversy, disclaimed as to the seven-eighths interest sued for by appellant, alleging that they were only nonparticipating mineral royalty owners under any mineral lease theretofore or thereafter executed on the premises. Appellant replied by supplemental petition that Jeffrey had by certain acts and pleadings ratified its lease and was estopped to deny the validity of the same.

At the conclusion of appellant's testimony, both parties requested an instructed verdict. The court instructed a verdict for appellees, except Johnson, against whom Jeffrey recovered on his cross-action, upon their motion that appellant failed to show superior title, in that the evidence failed to establish the common-law marriage between Wash and Rebecca Franklin as a matter of law.

In the main, appellant contends that its evidence established as a matter of law both the common-law marriage between Wash and Rebecca Franklin and its plea that appellee Jeffrey had ratified its lease from said Rebecca Franklin and her children. In this connection, and with respect to the common-law marriage, appellant contends that same was conclusively established when the testimony of Rebecca Franklin, which the trial court excluded as being in violation of article 3716, inhibiting her, a statutory incompetent witness, from testifying as to transactions with or statements by her deceased common law husband, is considered with the other evidence adduced. In the alternative, appellant. contends that, if such common-law marriage or its plea of ratification were not established as a matter of law, then such issues were for the jury under the evidence.

█ If she had been permitted to have done so, Rebecca Franklin would have testified, in substance, as follows: That about the year 1891 or 1892 she and Wash Franklin became engaged to marry; and that at the time of the engagement Wash Franklin was requested by her to talk to her parents about their marriage; that Wash Franklin did talk to her. parents about their marriage, and immediately thereafter told her that her parents consented to the marriage; that about that time the question of the time of marriage came up and the question of getting a marriage license came up between them, and that Wash Franklin told her that it was not necessary to have a license to get married, and took a Bible and read to her from the scriptures to the effect that "whatever God has joined together, let no man put asunder," and that, on account of Wash Franklin's insistence that they needed no license to get married, she consented to become his wife without a ceremonial marriage, and that they immediately began cohabiting and openly living together as husband and wife; that she lived with him, kept house for him, cooked for him, worked on the farm, and bore seven children, and that Wash Franklin was the father of each and all of said children; that they continued in that relation for fourteen or fifteen years; that three of said children died in infancy; that she left Wash Franklin after about fourteen or fifteen years and lived at other places and apart from him; that Wash Franklin, during the time they lived together, recognized her as his wife, and she recognized him as her husband, and he always recognized as his own the children born to them, the four living children being named Savannah Franklin, now Savannah White, wife of Tom White, Emzie Franklin, Wayman Franklin, and Helen Franklin, all of age; that the children who died were buried and the funeral expenses paid by Wash Franklin; that during the time she lived with Wash Franklin their children also lived with them, and Wash Franklin supplied all the food and clothing for her and her children; that during Wash Franklin's last illness he sent for her and her children, and that she and some of the children went down there and stayed with him for some time during said illness, one child, Emzie Franklin, remaining with him continuously until his death; that two or three days before his death she was compelled to return to Williamson county, where she was then living, to see about her child, Helen Franklin, who was in school, and that Wash Franklin died before she returned; that she attended his funeral; and that, when Wash Franklin was on his deathbed, he made a statement in her presence, and in the presence of Emzie Franklin, that after his death he wanted his children to each have 100 acres of his land and $1,000 apiece; that Wash Franklin had no children other than those born to her; and that she had no other children.

The trial court erred in excluding this testimony. The provisions of article 3716, under which the testimony was excluded, have no application under the undisputed facts, which show that Rebecca Franklin and her children of the common-law marriage had in good faith parted with all their right, title, and interest in the land in controversy prior to the institution of this suit, and that they were not parties to, nor had any real interest in, the subject-matter of this suit. Under such facts, the admissibility of this testimony is no longer an open question. Stevens v. Masterson, 90 Tex. 417, 39 S. W. 292, 299, 921; Parker v. Cockrell (Tex. Civ.

App.) 31 S. W. 221; Ferguson v. Coleman (Tex. Civ. App.) 208 S. W. 571; Parker v. Nusbaumer, 21 Tex. Civ. App. 180, 50 S. W. 646; Martinez v. Bruni (Tex. Civ. App.) 216 S. W. 655; Cox v. McClave (Tex. Civ. App.) 22 S. W.(2d) 961; Lassiter v. Bouche (Tex. Com. App.) 14 S.W.(2d) 808; Texas Law Review, Vol. 5, No. 2, pp. 156, 157; Newton v. Newton, 77 Tex. 508, 14 S. W. 157; Roberts v. Yarboro, 41 Tex. 449; Markham v. Carothers, 47 Tex. 25; Tyson v. Britton, 6 Tex. 224; Leahy v. Timon, 110 Tex. 73, 215 S. W. 951; Osborn's Adm'x v. Cummings, 4 Tex. 12.

The above conclusion is also applicable to the excluded testimony of Savannah White, a daughter of Wash Franklin, deceased.

The parties to this marriage were uneducated negroes. The other witnesses were likewise uneducated negroes, and, while their evidence may not be entirely explicit, it in substance showed that Wash and Rebecca Franklin lived together "off and on" for about fifteen years; that during that time they recognized each other as husband and wife, and bore the reputation in the community as husband and wife, doing those things ordinarily done by husband and wife; that either six or seven children were born to them while they were so living together; and that Wash Franklin recognized the children as his own, cared for them in sickness, clothed and fed them, and tried to educate the girl children by sending them away to school. The children all bore the Franklin name. The living children were all over twenty-one years of age at the time of this trial, and some of them testified that their father and mother lived together, slept together, and conducted themselves as husband and wife until they separated some ten or twelve years prior to Wash's death; that during his last illness Wash sent for all of his children and his wife, and that they all visited him and attended his funeral.

While we cannot say that the preceding evidence established as a matter of law the common-law marriage in question, because the credibility of the witnesses was a matter for the jury, still it would have abundantly supported the jury's finding of such common-law marriage, and the trial court erred in taking the case from the jury. As the first act looking to marriage, the evidence showed at least an implied, if not an express, agreement between Wash and Rebecca to take each other for husband and wife thenceforth and forever; that is, they became engaged to be married. Wash sought and obtained the consent of Rebecca's parents to the marriage, and, after Wash convinced her that a marriage license was not necessary, Rebecca, "consented to become his wife without a ceremonial marriage." As the second act looking to marriage, this agreement was immediately followed by cohabitation of the par-

ties, which means, as applied to common-law marriages, and to this case, living together, claiming to be married, in the relationship of husband and wife, doing those things ordinarily done by husband and wife, for a period of about fifteen years; and that while so living together as husband and wife there were born to them six or seven children, who were recognized and cared for by them as the children of that union. When an agreement, either express or implied, to marry is shown, and it is immediately followed by cohabitation as that term is above defined, the law is disposed to raise presumptions in favor of the legality of the relationship of the parties, of the marriage for all purposes, and of the legitimacy of the children born and recognized by the parties during the relationship. The evidence detailed established every essential element of a common-law marriage under the rules announced by the following decisions on the subject: Edelstein v. Brown, 100 Tex. 403, 100 S. W. 129, 123 Am. St. Rep. 816; Brooks v. Hancock (Tex. Civ. App.) 256 S. W. 296; Clover v. Clover (Tex. Civ. App.) 247 S. W. 300; Simmons v. Simmons (Tex. Civ. App.) 39 S. W. 639; 3 R. C. L. § 5, page 725; Orthwein v. Thomas, 127 Ill. 554, 21 N. E. 430, 4 L. R. A. 434, 11 Am. St. Rep. 159; Grigsby v. Reib, 105 Tex. 597, 153 S. W. 1124, L. R. A. 1915E, 1, Ann. Cas. 1915C, 1011; Berger v. Kirby, 105 Tex. 611, 153 S. W. 1130, 51 L. R. A. (N. S.) 182; Schwingle v. Keifer, 105 Tex. 609, 153 S. W. 1132; Bridgewater v. Hooks (Tex. Civ. App.) 159 S. W. 1004; Grice v. Express Co. (Tex. Civ. App.) 248 S. W. 82; Burnett v. Burnett (Tex. Civ. App.) 83 S. W. 238; Joske v. Irvine, 91 Tex. 574, 44 S. W. 1059; Frazier v. Hanlon Gasoline Co. (Tex. Civ. App.) 29 S.W.(2d) 461; Clutter v. Wisconsin Texas Oil Co. (Tex. Civ. App.) 233 S. W. 322; Henderson v. Burkholder (Tex. Civ. App.) 29 S.W.(2d) 937; Speer on Marital Rights (3d Ed.) p. 37.

The question of whether appellee Jeffrey ratified appellant's mineral lease from Rebecca Franklin and her children was also one for the jury under the pleadings and the evidence adduced. Appellant's lease was of record before Rebecca Franklin and her children filed the trespass to try title suit against Burt Brydson. Appellant was not made a party to that suit. Brydson therefore recovered only such interest as the Franklins had as against appellant. Jeffrey purchased Brydson's interest with knowledge both actual and constructive of appellant's lease, and thereafter, in September and October, 1929, sold mineral royalties to some of the appellees, the mineral deeds in each instance providing that: "It is distinctly understood and herein stipulated that said land is under an oil and gas lease made by grantor, providing for a royalty of 1/8 of the oil, and certain royalties or rentals for gas and other minerals; and

that grantee herein shall receive one-eighth of the royalties and rentals provided for in said lease, but he shall have no part of the annual rentals paid to keep said lease in force until drilling is begun."

[redacted] Jeffrey instructed the scriveners of these royalty deeds what to state in and to convey by them. He knew at the time these royalty deeds were executed that the only mineral lease on the land in controversy was that of appellant. Jeffrey was called as a witness for appellant to the preceding facts. On cross-examination by his own attorney, he testified in substance, over the objection that the testimony contradicted the terms of his royalty deeds, that he did not tell the attorneys who prepared these royalty deeds "that this land was subject to an oil and gas lease." Jeffrey was also permitted to testify, over the objection that the testimony called for a conclusion of fact as well as of law on the part of the witness, as follows: "I did not consider the lease of the Humble Oil & Refining Company as a valid lease." Clearly these objections should have been sustained. However, if this testimony had been excluded, still Jeffrey's testimony was sufficient to raise the jury question as to whether he intended to ratify appellant's lease by the execution of these royalty deeds; especially is this true in view of the fact that the royalty deeds made no specific mention of appellant's lease, nor any reference to the book and page where same was recorded, and in view of the further fact that the royalty interests conveyed by these deeds vested under any mineral lease theretofore or thereafter executed on the land. It is settled law that ratification involves the intention to ratify. Texas & Pac. Coal & Oil Co. v. Kirtley (Tex. Civ. App.) 288 S. W. 619 (writ refused); 2 Pomeroy's Equity Jurisprudence (4th Ed.) § 964, p. 2089. But the preceding evidence on the issue of ratification would have fully supported a jury finding of ratification, and the issue was therefore for the jury.

Appellant also contends that, since Jeffrey's claim of title is through the judgment in favor of Brydson against the Franklins, the identical parties who executed the oil and gas lease to appellant, and since Jeffrey pleaded that appellant's lease had terminated by its own terms for failure to pay the annual rental, he thereby ratified the lease. If Jeffrey obtained through that judgment all the remaining interest the Franklins had in the land subject to appellant's lease, which is not denied by appellant, then, of course, Jeffrey could assert any condition of defeasance which the Franklins could have asserted under the terms of the lease.

[redacted] We do not sustain appellant's contention that Jeffrey's claim of title through Brydson's judgment against the Franklins is inconsistent with the claim of title asserted by his pleadings. Appellee Jeffrey contends in his brief that he did not plead that judgment as his source of title, but merely pleaded it in estoppel of appellant's claim that it had purchased the oil and gas lease as an innocent purchaser and for value. Whatever merit this defense may have is not material here, since no proof was offered in support of it. Nor do we sustain appellant's further contentions in this connection that the effect of Jeffrey's pleadings was to blow hot and cold with regard to the validity of its lease; that is, that Jeffrey could not sell mineral royalties with reference to the lease and then answer in bar of this suit that the lease had terminated by its own terms for failure of appellant to pay the annual rental. The plea that the lease terminated for failure to pay rental was an alternative plea, and not applicable except upon condition that appellant established the validity and superiority of its lease. If appellant established its lease, then appellee Jeffrey, as the successor to the fee-simple title of the Franklins, could assert any condition the Franklins could have asserted as terminating the lease. This discussion, however, has reference only to the contentions of appellant that appellee Jeffrey ratified its lease and that Jeffrey pleaded inconsistent defenses; and not to the merits of the plea that the lease terminated for failure of appellant to pay the annual rental, because the agreed facts show that appellant paid the rental as provided for in the lease, and that defense need not be tried or submitted on another trial of the case.

Nor is there any warrant for the contention of appellant that appellee Jeffrey only claimed title through the judgment in favor of Brydson against the Franklins, the identical parties who executed the oil and gas lease to appellant. Appellee Jeffrey expressly pleaded that he deraigned his title through Burt Brydson and George and Margaret Haswell from Wash Franklin, the agreed common source of title.

[redacted] Nor do we sustain appellant's proposition relative to the refusal of the trial court to hear certain proffered testimony for the purpose of showing, or tending to show, that this suit was not barred by the Brydson judgment against the Franklins. Such was a defensive matter, and, until appellee offered proof in support of the allegation, it was not necessary to appellant's cause of action.

We pretermit further discussion of the pleadings and evidence as presented by this appeal, and the judgment of the trial court as regards the Humble Oil & Refining Company is reversed, and the cause remanded for another trial.

Reversed and remanded.