## DRUMMOND et al. v. BENSON et al.

### No. 10519.

Court of Civil Appeals of Texas. San Antonio.

Oct. 4, 1939.

Rehearing Denied Nov. 15, 1939.

Swearingen & Miller and John J. Cox, all of San Antonio, Perkins & Floyd, of Alice, and Spafford & Spafford, of Dallas, for appellants.

John T. Spann, of Crystal City, and D. A. McAskill, Ball, Seeligson & Trueheart, and Morriss & Morriss, all of San Antonio, for appellees.

SLATTON, Justice.

Amy Benson, as next friend of her minor child, joined by her four other children and her deceased husband's four brothers, brought this suit against James Newton Drummond, et al., to recover certain lands situated in Duval County, Texas. Drummond and his coparties moved to amend the judgment rendered by the District Court of Duval County in the year 1928. After notice and hearing the court entered the amendment "nunc pro tunc." Amy Benson and her coparties attacked the judgment as amended. The ground of attack of Amy Benson and her children against the amended judgment was that they did not authorize the institution and prosecution of the suit in which the amended judgment was rendered.

The theories of recovery were upon an alleged common law marriage between C. O. Drummond and Mary Benson, and that the Benson boys were the sole heirs of said C. O. Drummond and Mary Benson, both deceased, and a parol trust under which C. O. Drummond held title for the Bensons. The trial court directed a verdict against four of the Bensons; viz., Zachariah, Otto, Alvin and Joseph. Evidently upon the ground that the amended judgment was a bar to a recovery in their behalf.

The cause between the remaining parties was submitted to the jury in the form of special issues. The jury found the following:

Amy Benson did not authorize anyone to enter her appearance as an individual in suit No. 3178, styled Amye Benson et al. vs. E. H. Drummond et al., in the District Court of Duval County, Texas.

Amy Benson did not authorize anyone to enter her appearance as next friend of the minor children, Charles O. Benson, T. W. Benson. Idabel Evans (nee Benson) and Elizabeth Broxton (nee Benson) in suit No. 3178, styled Amye Benson et al. vs. E. H. Drummond et al., in the District Court of Duval County, Texas.

Amy Benson did not have notice of the filing of Cause No. 3178 at the time thereof or within six months after June 18, 1928.

Nell Benson Baker is the daughter of Tom Benson, deceased, and Amy Benson.

After the death of Katherine Tennessee Drummond, C. O. Drummond and Mary Benson entered into a mutual agreement to live together as husband and wife.

Pursuant to such agreement C. O. Drummond and Mary Benson thereafter lived and cohabited together as husband and wife.

Pursuant to such agreement C. O. Drummond and Mary Benson held each other out thereafter to the public generally as husband and wife.

Part of the money with which C. O. Drummond acquired land belonged to Tom Benson.

All of the land involved in this case was so acquired by C. O. Drummond.

One-third of the land involved in this case was acquired with money belonging to Tom Benson.

Part of the money with which C. O. Drummond acquired land belonged to Mary E. Benson.

All the land involved in this case was so acquired by C. O. Drummond.

One-third of the land involved in this case was acquired with money belonging to Mary E. Benson.

C. O. Drummond agreed with Mary E. (Betty) Benson, Tom Benson, Zachariah Benson, Otto Benson, Alvin Benson and/or Joseph Benson, or either of them, that the said Mary E. Benson and her sons should labor and furnish money to be turned over to and used by C. O. Drummond in the purchase of land in his name and held by him during his natural life for the benefit of Mary E. Benson and her sons.

Mary E. Benson and her sons complied with their part of said agreement.

All the land involved in this case was acquired by C. O. Drummond in pursuance of said agreement.

The defendants H. H. Henderson, W. W. Harvey, Reliance Oil & Royalty Corporation, Foster Petroleum Corporation, Foster Minerals Corporation, The Alamo National Bank of San Antonio, Texas, Sid Katz, A. H. Richardson, J. H. Reynolds and Mrs. J. H. Reynolds, or either of them, at the time of their, or either of their purchase of their respective oil and gas leases and oil and gas royalties in the land in controversy, had notice of the existence of such agreement.

All of the defendants involved in this case had such notice.

Defendants H. H. Henderson, W. W. Harvey, Reliance Oil & Royalty Corporation, Foster Petroleum Corporation, Foster Minerals Corporation, The Alamo National Bank of San Antonio, Texas, Sid Katz, A. H. Richardson, J. H. Reynolds and Mrs. J. H. Reynolds, or either of them, at the time of their, or either of their purchase of their respective oil and gas leases and oil and gas royalties in the land in controversy had notice that such lands had been bought by. C. O. Drummond with money earned by Tom Benson.

All the defendants involved in this case had such notice.

The defendants H. H. Henderson, W. W. Harvey, Reliance Oil & Royalty Corporation, Foster Petroleum Corporation, Foster Minerals Corporation, The Alamo National Bank of San Antonio, Texas, Sid Katz, A. H. Richardson, J. H. Reynolds and Mrs. J. H. Reynolds, or either of them, at. the time of their, or either of their purchase of their respective oil and gas leases and oil and gas royalties in the land in controversy had notice that such lands had been bought by C. O. Drummond with money belonging to Mary E. Benson.

All the defendants involved in this case had such notice.

The defendants H. H. Henderson, W. W. Harvey, Reliance Oil & Royalty Corporation, Foster Petroleum Corporation, Foster Minerals Corporation, The Alamo National Bank of San Antonio, Texas, Sid Katz, A. H. Richardson, J. H. Reynolds and Mrs. J. H. Reynolds, or either of them, at the time of their, or either of their purchase of their respective oil and gas leases and oil and gas royalties in the land in controversy had notice that Amy Benson did not authorize any one to enter her appearance as an individual in said suit No. 3178.

All the defendants involved in this case had such notice.

The defendants H. H. Henderson, W. W. Harvey, Reliance Oil & Royalty Corporation, Foster Petroleum Corporation, Foster Minerals Corporation, The Alamo National Bank of San Antonio, Texas, Sid Katz, A. H. Richardson, J. H. Reynolds and Mrs. J. H. Reynolds, or either of them, at the time of their, or either of their purchase of their respective oil and gas leases and oil and gas royalties in the land in controversy had notice that Amy Benson did not authorize anyone to enter her appearance as next friend of the minor children Charles O. Benson, T. W. Benson, Idabel Evans (nee Benson) and Elizabeth Broxton (nee Benson) in suit No. 3178.

All the defendants involved in this case had such notice.

The defendants H. H. Henderson, W. W. Harvey, Reliance Oil Corporation, and the Alamo National Bank at the time they erected the improvements upon the land in controversy and drilled the wells thereon and equipped the property for oil production and in producing oil therefrom did so in good faith under an honest and reasonable belief that their title to the mineral leasehold estate in said land was superior to the claim of title, if any, made by the plaintiffs.

The trial court rendered judgment in favor of Amy Benson and her children for the title to an undivided one-fifth interest in and to the land in suit and for the value of one-fifth of the oil produced in excess of the cost of production.

The aggrieved parties have appealed.

The appellants contend that the evidence does not show a common law mar

riage between C. O. Drummond and Mary Benson. That the parol trust alleged is illegal and unenforceable, in that it is contrary to public policy.

Our discussion will be limited to the contentions stated, because we consider them controlling on this appeal.

C. O. Drummond, the common source of title, was born January 11, 1840. He married Katherine Tennessee Drummond October 9, 1873. The family moved to the Loma Alta community, along the line between Duval and McMullen Counties, in the year 1887. The Drummonds moved to the community in a farm wagon and brought with them a milk cow and some goats. Mary Benson, a niece of Mrs. Drummond, and her four boys accompanied the Drummonds to the community and lived with them for about one year. Thereafter they moved to a farm north of San Diego which was rented for about two years. Thereafter C. O. Drummond bought a 240 acre tract of land, about ten miles north of San Diego, and he and his wife and Mary Benson and her boys moved and lived together for three or four years, in a small frame house, until about 1894 or 1895. About that time Mary Benson and her four sons, whose ages were then 18, 15, 12 and 7 years, moved away from C. O. Drummond and his wife and leased a part of the public land in the Loma Alta Community, on which they built a frame house and dug two wells.

In 1898 or 1899 Mary Benson and her four boys took another lease from the State of Texas and moved upon the land, after which time C. O. Drummond and wife moved on the place that Mary and her boys had previously occupied.

While Mary Benson and her boys were living on the last lease another son was born to her. In 1903 and 1904 Tom Benson, Zachariah Benson and Otto Benson made the down payment and obligated themselves for the remainder of the purchase price to the State, as settlers, on the land where Mary Benson and her five boys lived.

In 1906 Tom Benson, the oldest son of Mary Benson, married Amy Benson and took her to live with his mother and four brothers. In 1908 Mary Benson and her five sons and daughter-in-law, Amy, and her grandson, Tom, Jr., moved from the Duval County land, which they sold, to the town of Crystal City, Texas. Mary Benson died at Crystal City in 1919.

After Mary Benson and her family moved from Duval County to Crystal City, and until Mrs. Katherine Drummond's death, in April or May, 1916, C. O. Drummond and his wife, Katherine, lived on a part of the land in suit. During such time C. O. Drummond would drive horses from his ranch home in Duval County to Crystal City, in Zavalla County, where he would sell the horses and return to his ranch in Duval County. While at Crystal City he stayed with Mary Benson and her boys.

Tom Benson went to work as a section hand on a railroad and moved his wife and Tom, Jr., from Crystal City, but Mary Benson remained in Crystal City with her four other boys. They lived on a lot with two houses, a two-room house in front and a one-room house behind. In the front house there was a bed room and kitchen. Mary lived in the front house and the sons lived in the back house. There were two beds in the house in the rear, but only one bed in the front house. During the period of time from the removal of Mary Benson to Crystal City to the death of Mrs. Katherine Drummond (some eight years) C. O. Drummond went to Crystal City to sell his horses and evidently slept with Mary in the one bed in the front house. Mrs. Katherine Drummond died in Duval County in the spring of 1916, and at the request of C. O. Drummond was buried in the yard behind the house. At the time of her death C. O. Drummond was seventy-six years of age and continued to live at the ranch and cook for himself for some time. After the death of Mrs. Katherine Drummond, and before the death of C. O. Drummond, December 3, 1918, a period of some thirty months, C. O. Drummond went to Crystal City two, or possibly more, times. Some of the witnesses stated that during the year 1916 and 1917, C. O. Drummond was seen at Mary Benson's home "off and on", "part of the time." One of the witnesses said C. O. Drummond spent as much time in Crystal City as he did in Duval County. Another witness testified that he did not know how long Drummond stayed with the Bensons at Crystal City, but that he never stayed very long at a time; maybe two months, three months, four months at a time. That Drummond made trips there for two or three years. The appellees introduced a letter, dated November 2nd, 1918, from C. O. Drummond to Zach Benson, in which it is said: "I got home the 22nd day of Oct. from San Antonio (evidently meaning the

ranch home). * * * The doctor in San Antonio told me to go to the coast and stay there. * * * So I concluded I would settle in San Diego and live and die here. I have rented me a house and my things will be here from the ranch tomorrow. I know all these people and they all know me, and if I get down or sick I can get medical attention and the people will help me. I am so glad I left Sanderson when I did, for if I had stayed there longer I would have taken the grippe and died there, for I could not lie down when I left there, choking all the time."

Evidently some time between August and October, 1918, the Bensons and C. O. Drummond left Crystal City for Sanderson, where some of the Benson boys worked as section hands on the railroad and where Tom Benson and his family had previously moved.

C. O. Drummond died December 3, 1918, in the house referred to in his letter. On his death bed he asked that the Bensons be notified and requested to come to him. He directed that his body be buried beside that of his wife. The Bensons did not attend the funeral. The Bensons did not go to San Diego during the last illness of C. O. Drummond.

Mary Benson died in Crystal City November 13, 1919, of cancer, from which she was bedridden long before her death. During the times C. O. Drummond was in Crystal City he was introduced by Mary Benson and her sons as the uncle of the Bensons. The Benson boys and appellee Amy Benson addressed C. O. Drummond as "uncle". Amy Benson testified that the reason her husband and his brothers called C. O. Drummond "Uncle" was "to conceal the fact that he was their father." Mary Benson was known in the community of Crystal City as Mrs. Benson and as widow Benson. The neighbors in Crystal City never knew C. O. Drummond to introduce Mary Benson as his wife, and never heard that she was his wife, nor that they were living together as man and wife. The death certificate of Mary Benson contained the name Mary Benson.

One witness testified that he heard C. O. Drummond speak of Mary Benson as his wife. The witness explained that when he was a bare-foot boy riding a bicycle he heard C. O. Drummond say that "they could go ahead and sell those cows and he would buy his wife a cow." "That is the only time I heard him mention it." He further testified that he heard this remark between the fall of 1915 and the latter part of 1917. He thought it was in 1916, but he did not know whether it was the first part or last part, and that he did not know what wife C. O. Drummond was talking about. The witness was interested in the outcome of the suit.

Another witness testified, over objection, the following: "Well one day I was over there and I just asked Mrs. Benson, I says 'who is Uncle Drum anyway?' They called him Uncle Drum. She told me she said 'that is my husband. That is Pinkey's father and the other boys' father.'" On cross-examination it appears that the witness at the time of the conversation was nine years of age.

Another witness testified as follows:

"Q. All right Mr. Blankenship, just state about an agreement that Mrs. Benson told you that she and Mr. Drummond had if she told you about an agreement—I will ask you if she said they had an agreement? A. Yes, sir.

"Q. Now, then, what was that agreement according to what she said to you? A. Well, she told me that after Aunt Tenn—she always called Mrs. Drummond Aunt Tenn,—died * * * she told me that Mr. Drummond came to Crystal City after Mrs. C. O. Drummond was buried and that they renewed their relation as man and wife and lived together, and that Mr. Drummond was going back to make disposition of the property here and come back and live with her and the boys.

"Q. Renewed their relation as man and wife? A. Yes, sir.

"Q. She said he was coming back for what purpose—I didn't get that? A. Dispose of what few stock he had on his ranch here and to lease his ranch out prior to going back to Crystal City to make his home with her and the boys. * * * And he (Drummond) told me he had disposed of his stock and was going to lease his ranch out and go back and live with Bet and the boys."

Another witness testified that he saw C. O. Drummond in Del Rio in 1918 and that Drummond told him that he had closed out the business down at San Diego and practically had disposed of all the livestock and he was then making arrangements to move —he called Mrs. Benson Betty—"I am going to move Betty and the boys out here to Sanderson." "He referred to them as his

family, as he always had with me and I don't think I ever met the old gentleman after that." At the third appearance on the witness stand he testified to the same conversation, and stated that Drummond "mentioned his family to me in that conversation and said that he made arrangements to move his wife Betty and his boys out there, and I never saw the old man alive afterwards." On cross-examination the witness stated that he had not seen Drummond from 1904 until 1918, and that he knew Drummond and the family intimately until 1904, and that Drummond's reference to Mary Benson as "my wife" did not surprise him, "Because I knew he had been living with her as his common law wife for years and years."

Another witness testified by deposition that she was seventy-three years of age, knew Mary Benson very, very well, all the Benson boys and Tom's wife, from 1910 until Mary's death. That they lived at Crystal City all of the time, except two or three months, when they went off to get work. That she knew C. O. Drummond very, very well. That Mrs. Benson never exactly told her that Drummond was her husband. That the Benson boys never told her that Mary Benson and C. O. Drummond were married. That as a general opinion C. O. Drummond and Mary Benson were husband and wife. That Mary Benson never "came out" and told her that C. O. Drummond was the father of Mary Benson's boys, but that it was generally understood that they were. That the Benson boys, nor any one of them ever told her that C. O. Drummond was their father. That the Benson boys called C. O. Drummond "Uncle Drum." That C. O. Drummond never told her that Mary Benson was his wife; that Drummond never told her that he was the father of any one of Mary Benson's boys. That she had never heard of Drummond or Mary Benson telling any one that they were husband and wife; that she never heard of C. O. Drummond telling any one that the Benson boys were his sons. That neither Drummond nor Mary Benson ever told her that they had agreed to live together as man and wife. That she had never heard from any one else that Mary Benson and Drummond had agreed to live together as man and wife.

■ The elements essential to a common law marriage are fairly well defined in the authorities. Grigsby v. Reib et al., 105 Tex. 597, 153 S.W. 1124, L.R.A.1915E, 1,

Ann.Cas.1915C, 1011; Berger v. Kirby, 105 Tex. 611, 153 S.W. 1130, 51 L.R.A., N.S., 182.

"All that is necessary to constitute [a common law] marriage is that if the parties mutually agree and consent together to become husband and wife, and thereafter carry out that agreement and live and cohabit together as husband and wife." Grigsby case, supra [105 Tex. 597, 153 S. W. 1125, L.R.A.1915E, 1, Ann.Cas.1915C, 1011].

The agreement between the parties to become presently husband and wife, which is an essential element of a common law marriage, is easily understood and its application is not difficult. The difficulty which arises in this class of cases is in the application of what is meant by the term "live and cohabit together as husband and wife." It is clearly the law in this State that the mutual consent of parties to become husband and wife, without living and cohabiting together as such, pursuant to the agreement, does not constitute a common law marriage. Authorities supra. The term "live and cohabit together as husband and wife" evidently means a living together, claiming to be married, in the relationship of husband and wife. Humble Oil & Ref. Co. v. Jeffrey, Tex. Civ.App., 38 S.W.2d 374 and authorities cited.

We shall presently discuss the agreement which is the first necessary element.

■ The agreement, of course, may be express or implied.

We have quoted above the only evidence which could be construed to be an attempt to prove an express agreement between C. O. Drummond and Mary Benson to presently become husband and wife. It amounted to no more than a declaration of Mary Benson that C. O. Drummond after the death of his wife, Katherine, had gone to Crystal City and they had renewed their relation as man and wife and lived together. Their relations before the death of Mrs. Katherine Drummond could not be, under the law, that of husband and wife. If it is true, as appellee contends, that the Benson boys are the sons of C. O. Drummond and Mary Benson they were born of a relation existing between C. O. Drummond and Mary Benson which must be deemed illegal, since during such time C. O. Drummond had a living wife. Therefore, the declarations attributed to Mary Benson cannot be said to be an ex-

press agreement between the parties to become presently husband and wife. The agreement may be implied. The appellees insist that the Benson boys are the children of C. O. Drummond and Mary Benson, and that such boys were born at a time when C. O. Drummond had a living wife, "Aunt Tenn." If this be true, it must follow that Mary Benson and C. O. Drummond well knew their conduct to be illegal. For Mary Benson was the niece of "Aunt Tenn" and all had lived in a small house together until Mary and her four boys moved to themselves. After Mary and her four boys moved to themselves another son was born to Mary, whom they call Joseph, and the appellees claim him to be the son of C. O. Drummond. After Mary and her five boys moved to Crystal City C. O. Drummond made occasional visits there and stayed in the front house with Mary Benson while "Aunt Tenn" was still living.

■ Under these facts, the following rules of law are applicable: "Where the connection between the parties is shown to have been illicit in its origin, or criminal in its nature, the law raises from it no presumption of marriage." Crossett v. State, 97 Tex.Cr.R. 18, 260 S.W. 186, 188.

See Cuneo v. De Cuneo, 24 Tex.Civ. App. 436, 59 S.W. 284; Edelstein v. Brown, 35 Tex.Civ.App. 625, 80 S.W. 1027.

■ In the case of Consolidated Underwriters v. Kelly et al., Tex.Com.App., 15 S.W.2d 229, 230, it is said: "It frequently happens, especially in common-law marriages, that the marriage which, of course, includes the agreement to marry, is proved by circumstances, technically known as cohabitation. Proof that a couple lived together under the same name, introducing each other as husband and wife, respectively, recognizing their children, and the many other respects tending to show their marital status, is sufficient to prove a marriage."

■ It was said in the case of Schwingle v. Keifer, Tex.Civ.App., 135 S.W. 194, 195: "Where there is no direct and positive proof of the contract of marriage, it may be inferred or implied from the consistent conduct of the man and woman, and by an uncontroverted reputation in the community in which they live."

■ The facts of the present case, when tested by the foregoing rules of law,

do not establish a common law marriage between C. O. Drummond and Mary Benson. The inception of the relation, if as contended by appellees, was wrongful and illegal, and continued to be so until the death of Mrs. Drummond. There is no fact or circumstance to evidence an intent on the part of either C. O. Drummond or Mary Benson to change the relation that had theretofore existed. The living together was intermittent and not continuous, as it was before the death of Mrs. Drummond. Mary Benson continued to use the name Benson, not Drummond. They did not introduce each other as husband and wife. The Benson boys continued to use the name Benson, not Drummond. They continued to address Drummond in the same manner as before. Amy Benson, one of the appellees, testified that Drummond was called "Uncle" or "Uncle Drum" to conceal the fact that he was the father of the boys.

The nearest neighbors, who testified by deposition, stated that no one told them that Drummond and Mary Benson were man and wife, and that said parties had never told them of such a relation between said parties. The isolated references, according to declarations attributed to Mary Benson and C. O. Drummond, wherein one or the other referred to each other as husband or wife, do not, in our opinion, satisfy the law in establishing a common law marriage. The letter from C. O. Drummond, dated about one month before his death, to Zach Benson, which was offered in evidence by the appellees, shows that Drummond considered his home in Duval County. The letter repels the contention of appellees that Drummond was the common law husband of Mary Benson. The Benson boys and Mary Benson are not referred to as the sons or wife of C. O. Drummond. It shows that Drummond and Allie left Duval County in August, and the amount of the expense that had been incurred in San Antonio, during Drummond's illness there. It shows that neither the Benson boys, nor Mary Benson attended him during such illness. It is evident from the letter that Drummond, on account of his health, decided that he would "settle in San Diego and live and die here." "I know all these people and they all know me and if I get down sick I can get medical attention and the people will help me." If Drummond had considered himself the husband of Mary Benson and the father of the four Benson boys

then living and unmarried, surely some aid and assistance in illness would reasonably have been expected from the Benson boys or Mary Benson. If Drummond and the Benson family had recognized the relations of husband and wife and father and sons to exist between the parties, surely during the last illness when Drummond had Allie Benson notified of such illness, some of the Benson family would have responded and attended the elderly man in such illness, or at least attended his funeral.

These and many other facts in the record repel the suggestion that C. O. Drummond and Mary Benson, mutually agreed to become husband and wife, and in pursuance to such agreement, lived and cohabited together as man and wife.

It is true that the record reflects many declarations attributed to C. O. Drummond which evidence an affection for the Benson boys and a desire on the part of Drummond to leave the boys his property upon his death. Such declarations further indicate that Drummond recognized the necessity of making a will in order to effectuate that desire. Drummond evidently changed his mind in that regard, because the record shows that he died intestate.

These facts serve to explain the verdict of the jury.

After a careful study of the entire record, the statements from the record in the briefs being challenged, we are of the opinion that the finding of common law marriage in the verdict of the jury is without support in the evidence and must be set aside.

██ The only remaining ground of recovery available to appellees, as shown by the pleadings and the verdict of the jury is the trust theory.

The appellees alleged that Tom Benson worked and labored to make money to pay for the land and that their labors and the moneys received therefrom were taken by C. O. Drummond and were used by him to pay the purchase price of said lands and plaintiffs therefore say that the heirs of T. W. Benson, deceased, became the equitable owners of said lands, by reason of the expenditure of their own money in the purchase of said lands. "In this connection plaintiff would further show to the court that prior to the purchase of said lands it was agreed by and between the said C. O. Drummond and the said Mary

E. Benson and her sons that she and said sons should labor and furnish such moneys as they could, to be turned over to said Drummond and used in the purchase of said land, which should be taken by Drummond and held in trust for Mary E. Benson and sons, and plaintiffs further say that the moneys made and furnished by their mother, Mary E. Benson, and her children, in fact paid for the lands involved in this suit, and that such moneys were taken and used by the said Drummond, deceased, under and by virtue of the agreement aforesaid, that he should use such moneys in the purchase of said lands and should take title thereto in his own name and should thereafter hold the same during the term of his natural life for these plaintiffs, and by reason of such acts plaintiffs now say that they are the equitable owners and holders of said land and are now entitled to recover judgment for the title to and possession of said land, together with all the improvements thereon."

The record shows that the land involved was purchased from the State of Texas on July 6, 1903, by Wenceslado Serna. On November 28, 1903, Drummond purchased from Serna forty acres of Section 308 and 160 acres of Section 392. Serna allowed the remaining 654 acres out of said Sections to lapse for non settlement.

On November 2, 1906, Drummond made due proof of occupancy and a certificate was issued to him by the State Land Commissioner. The northeast forty acres out of Section 308 was paid out and patented to C. O. Drummond March 7, 1907, and the remaining 600 acres out of Section 308, and all of Section 392, were paid out in full by Drummond's administrator, September 16, 1924.

These lands were purchased under Articles 4218f, 4218ff, and 4218fff of the Revised Civil Statutes, 1895, as amended by Chapter 129 of the Acts of the 25th Legislature.

Under the above mentioned articles of the statute, Serna purchased from the State of Texas, and Drummond became a substitute purchaser.

The above Acts were amended April 15, 1905, by Chapter 103 of the Acts of the 29th Legislature. It was under this amended Act that Drummond purchased the remaining lands.

It is our opinion that the trust alleged in reference to the lands involved in this

suit is contrary to public policy and therefore illegal and unenforceable. Brown v. Brown, 62 Tex.Civ.App. 308, 132 S.W. 887 (writ refused); Perry v. Martin, Tex. Civ.App., 180 S.W. 1148 (writ refused); Houston Oil Co. v. Votaw, Tex.Civ.App., 184 S.W. 647 (writ refused); Rogers v. Blackshear, 60 Tex.Civ.App. 576, 128 S.W. 938.

Other questions are raised by the parties, but, in view of our ruling heretofore made, become immaterial and will not be discussed.

The record in this case is voluminous, many witnesses having testified, consuming several days in the trial court. The parties seemed to have explored every conceivable avenue for the procurement of the facts and circumstances surrounding the issues made by the pleadings. It therefore affirmatively appears to have been well developed in all its details in the trial court. Under these circumstances it is our opinion that we should here render the judgment which should have been rendered by the trial court. Freshwater v. Hoyt, Tex.Com.App., 259 S.W. 923.

The judgment of the trial court will be reversed and judgment here rendered that appellees take nothing by their suit and pay the costs of this and the lower court.

Reversed and rendered.