**Maryanna DICKENS, Individually and a/n/f of Anna Rachel Dickens and Rose Marie Dickens, minors, et al., Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 72–H–1494.**

United States District Court,
S. D. Texas,
Houston Division.

June 6, 1974.

846

Joseph D. Jamail, Jamail & Gano, Houston, Tex., for plaintiffs.

Olney G. Wallis, George E. Farrell, Asst. U. S. Attys., Houston, Tex., for defendant.

## MEMORANDUM AND ORDER

SINGLETON, District Judge.

This case is a civil action brought pursuant to Title 28, U.S.Code §§ 2671–2680, the Federal Tort Claim Act. The court has jurisdiction of the action pursuant to Section 1346(b) of Title 28, U.S.Code. All administrative remedies required under Section 2675, Title 28, U.S.Code, have been exhausted prior to the filing of this lawsuit and this court has jurisdiction of all claims and allegations of negligence against the defendant as presented in the trial.

## FACTS

On April 22, 1970, a twin-engine Beach, model D–5 airplane, serial number DH–257, bearing FAA registration number N1661, crashed near Austin Municipal Airport in Austin, Texas.

At the time of the crash, the aircraft (hereinafter referred to as N1661) was piloted by Dr. Robert G. Farris, a pilot licensed for twin-engine aircraft who also had an instrument rating. Dr. Farris was a practicing neurosurgeon in Austin, Texas. The airplane carried five passengers: Mrs. Charlotte Farris, wife of the pilot; Judy and Marylann Farris, their daughters; Dr. Ben Becker, Jr., a business associate of Dr. Farris; and Jimmy Doyle Dickens, husband and father of the plaintiffs before the court. All six persons were killed in the crash, together with two other persons who were killed when the plane crashed into their home.

The crash occurred northwest of the Austin Municipal Airport, after the aircraft aborted its attempt to land on runway 16 right (hereinafter referred to as 16R).

The aircraft was owned by Tom H. Davis, an attorney in Austin, Texas. He purchased the plane in November 1968. Although Mr. Davis was the primary pilot of the plane, Dr. Farris had approximately sixty (60) pilot-flight hours in the plane prior to its crash. He and his associate, Dr. William Turpin, were checked out by Mr. Davis in this plane in November 1968, shortly after Mr. Davis purchased the aircraft. Dr. Farris was again checked out in the airplane by Mr. Davis immediately before the trip that ended in the tragic crash.

The last annual inspection for N1661 was on October 24, 1969. The home base for this plane was Austin, Texas, where it was hangered at Ragsdale Aviation.

The aircraft departed Austin, Texas, on April 18, 1970, terminating the flight in Washington, D. C., after en route stops at Galveston, Texas, and Nashville, Tennessee. It was at the intermediate stop at Galveston that Mr. Dickens was taken aboard the aircraft as a passenger.

The purpose of the trip to Washington, D. C., was to attend the annual meeting of the Cushing Society, the American Association of Neurosurgeons, being held there. Having finished his junior year in medicine at The University of Texas Medical Branch in Galveston, Texas, Jimmy Doyle Dickens had worked on a neuro-anatomy research project while earning a Masters Degree in Anatomy. He later worked with Dr. Farris and Dr. Turpin in Austin, Texas, during an elective quarter at the Medical Branch. During this externship, he exhibited to the neurosurgeons around him not only an intense interest in this field but also the ability to achieve his goal to be a neurosurgeon. The trip to Washington, D. C., was not only an opportunity for Dr. Farris to continue his recruiting of Jimmy Doyle Dickens into the field of neurosurgery, with the purpose of future association, but also an opportunity for Jimmy Doyle Dickens to assist in delivering a paper which he had helped prepare to the Association.

On April 22, 1970, at the conclusion of the Association meeting, Dr. Farris prepared to return with his passengers to Austin, Texas. Dr. Farris received a

weather briefing by telephone from the Washington, D. C., FAA Flight Service Station in preparation for the departure of N1661 from the Washington National Airport. Shortly thereafter N1661 departed Washington National Airport for the first leg of the journey to Atlanta, Georgia.

Dr. Farris routinely contacted several flight service stations by radio for en route weather information. He subsequently landed at Atlanta Airport, Atlanta, Georgia. He was given a weather briefing by telephone while there. After fueling the aircraft, N1661 departed Atlanta.

Dr. Farris routinely contacted several flight service stations en route to Austin, requesting and receiving en route weather information. Throughout the entire flight from Washington, D. C., to Austin, Texas, Dr. Farris did not indicate in any way that he was encountering any mechanical or other problems with the aircraft or the flight itself.

The Austin control facility is a dual facility known as a RAPCON. The radar portion of the facility is located at Bergstrom Air Force Base, and there is a visual tower facility at the municipal airport. From this position the FAA controllers give instructions to aircraft attempting to land at the Austin Municipal Airport. Throughout the trial however, "RAPCON" was used to refer to the facility at Bergstrom only and that term will be so used in the remainder of this opinion. The controllers located at Bergstrom give instructions until the aircraft arrives over the VORTAC or OMNI.[1] When an aircraft landing at Austin reports over the Austin VORTAC, the RAPCON FAA controller relinquishes his duties relating to the landing of the plane to the other control facility, the Air Traffic Control Tower at the airport. This procedure was followed for both aircraft involved in this case.

The first contact between N1661 and Austin came when Dr. Farris contacted Austin, Texas, approach control (RAPCON) and reported his location seventy-nine (79) miles east of Austin VORTAC at an altitude of 10,500 feet. He requested an instrument approach (IFR) to Austin.

Austin RAPCON advised Dr. Farris that if he could maintain visual flight rule (VFR) until twenty-five miles east of Austin, RAPCON would then give him IFR clearance in their assigned air space. Dr. Farris responded that he would maintain VFR according to Austin RAPCON instructions. RAPCON told him further that he could expect a VOR approach to runway 16R and gave the weather as measured 1,600 feet overcast, visibility seven miles, wind 180° at seven knots, and an altimeter setting of 2994. Dr. Farris acknowledged this transmission.

Dr. Farris complied with the request of Austin RAPCON and flew VFR until approximately twenty-six miles from the Austin VORTAC. At this time, Dr. Farris again contacted RAPCON and gave his location on the 065 radial on a course to the Austin VORTAC. Austin RAPCON was able to identify the aircraft on its radar at a distance of approximately twenty-three (23) miles from the VORTAC. The radar facilities are located at Bergstrom Air Force Base, a distance of several miles from the Austin Municipal Airport.

At this point, Austin RAPCON began issuing several course heading changes for Dr. Farris. The first heading change took N1661 off its then present heading to the Austin VORTAC and put it on a heading of 260°. This was issued by Austin RAPCON and promptly complied with by Dr. Farris. This in-

---

1. The VORTAC or the OMNI is an aircraft homing device buried in the ground at a certain designated place. The Austin VORTAC is located approximately 4.6 miles north of the Austin Airport. The facility beams a radio signal to the aircraft and gives it a reference point relative to its landing at the airport. The communications between Dr. Farris and the Austin RAPCON tower facilities consisted for the most part of course headings and directions to the VORTAC.

struction and all other instructions received by Dr. Farris were promptly and properly carried out by him as pilot of N1661.

Austin RAPCON next instructed Dr. Farris to change the heading of N1661 to 250°. A heading of 240° was next ordered by RAPCON and then a final heading change of 210°.

Along its flight path to the Austin VORTAC, N1661 was flying at a speed normal for that aircraft. N1661 made all course heading changes as directed by Austin RAPCON. Such changes in heading were made promptly and properly. This was observed by the Radar operator at RAPCON. At no time during any transmission with either the RAPCON or the tower did Dr. Farris, as pilot of N1661, state that he was experiencing any mechanical or other difficulty that would cause the plane to be flying slower than normal or endanger the flight. After making all course heading changes, N1661 passed directly over the VORTAC and commenced its final approach to runway 16 right.

Subsequent to the first communication between Dr. Farris and Austin RAPCON, Braniff Flight 255 from Dallas to Austin, notified Austin RAPCON of its approach to the Austin Municipal Airport. In making its approach FAA regulations required the Braniff Flight to fly at an indicated air speed below 250 knots when below 10,000 feet.

Braniff Flight 255 was initially given clearance to land on runway 16R. Braniff, however, requested clearance on runway 12R and this clearance was given by the Austin Tower. Such a change required the Braniff plane, approaching directly from the north, to fly a wide base leg so that it could land from the west on runway 12R. This maneuver, while performed without complications or problems by the Braniff flight, took such flight directly over the lights of the city of Austin. Such maneuver placed the plane and the lights of such plane directly in among the lights of the city. Such change of direction also required Braniff Flight 255 to be airborne

for a longer period of time than it would have been if it had landed on its straight-in approach to runway 16R. The Braniff Flight 255 made an uneventful landing on runway 12R.

The N1661 was directed to and did attempt to land on runway 16R shortly thereafter. All of the evidence leads to the conclusion that up to a point of somewhere near the intersection of runway 16R and 12R, at a height of from 15 to 75 feet above the runway, the approach was in all respects normal. When N1661 reached a location at or near the intersection something happened to cause N1661's otherwise perfectly normal landing approach to abort.

At least four persons on the ground witnessed N1661 as it came over the threshold of runway 16R. These witnesses were Mr. Stephen C. Fletcher, Mr. Stanley Ray Pantel, Mr. Robert Thomas Roberts, and Mr. Leon A. Vanholsbecke, Jr. Of these, Mr. Fletcher, Mr. Roberts, and Mr. Vanholsbecke testified. The court found Mr. Fletcher and Mr. Roberts to be credible witnesses. The court discredited Mr. Vanholsbecke's testimony.

Mr. Fletcher and Mr. Pantel were students at the University of Texas. Fletcher spent two years in the army; sixteen months were spent in Vietnam, from August 1967 to December 1968. He was assigned as an airborne sensor operator and aerial reconnaissance observer. His rank at his discharge was E–4, or Specialist 4th Class. He was a crew member on an army plane known as a "Gremlin OV–1 Mohawk" which he described as about the same size as, but a considerably heavier and more powerful aircraft than, N1661. His job as a visual reconnaissance operator was to make mental observations on the ground while flying.

Fletcher and Pantel were at the airport because Fletcher often relaxed after studying by watching aircraft land and take off at the Austin Municipal Airport. On the night in question they were standing at a fence some 160 feet north of the threshold of runway 16R.

Fletcher testified that he was standing approximately 400 yards north of this intersection. He and Pantel arrived at approximately 11:30 p. m. Shortly after arrival he observed Braniff 255 land on runway 12R. He testified that "a very very short time later" (after the landing of the Braniff 255) he became aware of the engine of another aircraft approaching behind him and aligned with runway 16R. He testified that he became aware of the aircraft because of the sputtering sound of the engines. He testified that he thought at the time that the pilot was having some trouble, but that he later learned that the type of engine with which N1661 was equipped made a sputtering or coughing sound when throttled back just before landing. According to Fletcher's testimony N1661 seemed to be making a normal level approach and was declining down what appeared to be a straight line along the axis of runway 16R. He observed nothing unusual in the attitude or anything else about the aircraft at that point. At approximately 600 feet in altitude N1661 was continuing down a glide slope that looked perfectly normal, coming across the hurricane fence directly over his left shoulder, proceeding toward the threshold of the runway. Fletcher did not see the landing gear in a landing configuration and testified on cross examination that he assumed it was up. Earlier he had written out a statement which indicated that he was "fairly certain" the landing gear was up. On cross he reiterated that conclusion. At about ten or fifteen feet off the ground the aircraft lurched or jumped into the air in what appeared to him to be an involuntary movement on the part of the aircraft. After this jump into the air of seventy-five or one hundred feet as it stopped its ascent, the aircraft had changed directions from 20° to 30° and was no longer aligned with the runway. It was then aligned at roughly 180° to 190°.[2] The aircraft was then flying directly away from him toward the treeline to approximately

west of the Austin Airport. It proceeded away from him for perhaps three-quarters of a mile at which point it went back to the right as if it were turning right. Finally, it crashed. He testified that it appeared to him that after what he described as a lurch or jump up, the pilot never regained control of the aircraft.

Fletcher and Pantel immediately went to the scene of the crash and, after staying there a considerable period of time, went to the Municipal Airport and left their names, addresses, and telephone numbers with the flight personnel. Some time later both were mailed forms by the National Transportation Safety Board (NTSB) on which they wrote out their statements (contained in defendants' Exhibit No. 17). Fletcher himself typed his statement and dated it April 19, 1974. It is entirely consistent with his testimony.

Pantel was not called as a live witness, but in his handwritten statement dated April 22, 1970, he describes the airplane's maneuver in this manner: "The plane was about 15 to 20 feet off the runway at one time. It suddenly lifted to about 75–100 feet and proceeded to make a sharp right turn. The turn was too sharp. . . ."

Mr. Roberts, also a witness on the ground, gave a typed statement dated May 11, 1970. Roberts was standing outside a hangar at Ragsdale Aviation on the northeast side of the airport. In court he testified that this location was about a half mile from the intersection of 16R and 12R. In his statement he does not locate himself other than by saying that he was standing outside a T hangar at Ragsdale Aviation. The scaled map introduced in evidence as Government's Exhibit No. 9 indicates that this location is a bit more than half a mile from the intersection of 16R and 12R. In any event, Mr. Roberts described it as follows: "I observed an aircraft on short final and on what appeared to be an approach at 16R. The

2. The heading of runway 16R is 150°.

aircraft descended to an altitude of 25 to 50 feet and had the runway made at which time power was applied for a go around. The aircraft did not gain altitude and approximately halfway down the runway the aircraft gained to an altitude of 100 feet." He said that all he could see of the aircraft was its lights.

The court has concluded that Mr. Roberts was not in as advantageous a position as Mr. Fletcher was to observe the N1661. His testimony and recollection are for that reason not as probative as those of Mr. Fletcher.[3]

It is apparent from the testimony of Mr. Choate and the other controller on duty in the tower, Mr. James Rankin, that Mr. Choate observed the plane go through an extraordinary and unusual movement at some point between the threshold of runway 16R and the intersection of 16R and 12R. Mr. Rankin testified that his attention was called to N1661 by a comment made by Mr. Choate which was something to the effect of, "He is not landing" or "I wonder what is wrong," concerning the approach of N1661. Immediately thereafter Mr. Choate called the pilot of N1661 and asked, ". . . you having any difficulty?" It is undisputed that FAA controllers are instructed, in laymen's language to "never get in the cockpit with the pilot," and it was Mr. Rankin's testimony that only if a controller observed an aircraft to be in an extraordinary and hazardous position, would he communicate with the pilot of that plane to attempt to find out the pilot's intentions.

A further fact to demonstrate that something extraordinary had occurred is that the examination of the wreckage of the destroyed aircraft showed that both engines of N1661 were running at substantial power at the time of impact.

The court heard the tape recordings and observed the voice transmissions between Dr. Farris and the tower opera-

tors, Mr. Kneram (at Bergstrom) and Mr. Choate (at the airport control tower). Up to a point there was nothing about Dr. Farris' voice that indicated that he was piloting the aircraft in any but a normal condition. As N1661 came over the threshold of runway 16R in what was described as a normal approach in all respects, something happened. The voice transcription of this tower tape leads inescapably to the conclusion that when Dr. Farris replied "in emergency," he was in extreme stress. The contrast in his voice from the preceding communication some seconds before when he said "o. k. say again the wind," is indeed startling.

The question for the court to determine is what did happen to N1661 to cause its aborted landing and subsequent crash. For this case the crucial questions become:

(1) Did the Braniff Flight 255, landing on runway 12R, generate wing-tip vortices which could be hazardous to a lighter aircraft attempting to land on runway 16R, at or near the intersection of the two runways?

(2) Had this turbulence dissipated by the time N1661 attempted to land so as to be of no consequence to N1661?

(3) Was the air-traffic controller duty bound under the circumstances to warn the pilot of N1661 of the possibility of wake turbulence which might be hazardous to his landing?

WAKE TURBULENCE PHENOMENON

Aircraft wings provide lift to the aircraft. Such lift is obtained by designing the wing so as to create a condition of low pressure on the upper surface of the wing and a condition of high pressure on the lower surface of the wing. This generates lift as the speed of the aircraft causes the air to flow past these

3. It is interesting that neither Mr. Pantel nor Mr. Fletcher nor Mr. Roberts was ever interviewed by the NTSB investigator. Mr.

Finch did testify that he talked to Mr. Pantel over the telephone, but it is undisputed that he never talked to Mr. Fletcher.

wing surfaces. Because of the difference in pressure at the wing-tip, the higher pressure from below laps over onto the upper surface of the wing. In flight, such movement of the air creates a vortex trailing behind each wing-tip, with each vortex resembling a horizontal cyclone behind each wing-tip. All aircraft, regardless of size, create wing-tip vortices. Such vortices can exist as turbulence in the air for several minutes after the passing of the generating aircraft. As an aircraft lands, the turbulence moves counterclockwise from the right wing and clockwise from the left wing. The turbulence is in the form of a mass of air, conical in shape. This turbulence stays low to the ground when generated by landing aircraft and its movement is affected by wind.

The force of the turbulence and the possible danger to other aircraft, according to information in the Airman's Information Manual, defendant's Exhibit No. 8, and FAA Advisory Bulletin, defendant's Exhibit No. 19, is directly related to the weight, wing span, and speed of the aircraft. The N1661 was a twin Bonanza which had been converted so as to accommodate Swearingen supercharged engines and a side door entrance. It was built by Beech Aircraft Company and was very similar to what is known today as a Beech Queenair. The Braniff Flight 255 was a BAC 1–111, a commercial jet airliner with a tail configuration commonly referred to as a T-tail. It is comparable to a DC–9 aircraft. Relative to N1661 it is a large aircraft, although it is not a "heavy jet," as that term was used by the expert witnesses. The Braniff aircraft was capable, however, of generating turbulence with a significant amount of force, which could have had an effect upon the N1661. The turbulence involved in this case was generated by the right wing of Braniff 255. The direction and intensity of the wind would move the turbulence from the intersection of runways 12R and 16R towards the north or the direction from which N1661 was attempting to land. In a number of minutes the wind would have further dissipated the turbulence so that it would have been of no danger to N1661. For that reason the weather conditions present at the time of the landing of Braniff 255, when the aircraft would have ceased to generate wake turbulence, and the time between the landings of Braniff 255 and N1661's encounter with the wake turbulence, if there was one, is critical.

Much time and effort has gone into a reconstruction of what happened that April night, but a precise determination of the time sequence is impossible. The major portion of the Government's reconstruction concerns the tapes made at the two Austin control facilities.

All FAA control facilities, including the one at Austin, have or should have tape recordings that record voice transmission between FAA controllers and pilots of aircraft with whom they are in communication. An intricate system of five-track recordings makes it possible to determine with almost precise accuracy the exact Greenwich mean time at which any particular voice communication is being made between the controller and the aircraft and vice versa. Although the RAPCON recording system did have a time track on its tape of the communication with N1661 and Braniff 255, for some unexplained reason the time was not recorded on the Austin tower tape. At the time of the accident, April 1970, the particular mechanism had not been working since 1968. It is impossible to know exactly the time of the actual communications between Mr. Choate and Braniff 255 and between Mr. Choate and N1661.[4]

It is interesting to compare the transcript of the conversation between

---

4. The plaintiffs attempted to make much of what they viewed as discrepancies in various copies of tapes made from the original tower and RAPCON tapes. The court concluded during the course of the trial that most of the testimony and controversy surrounding these tapes constituted a tempest in a teapot, having no critical or material value to the case.

N1661 and the Atlanta Airport and the transcript of the RAPCON and Tower tapes. The Atlanta transcript not only contains Greenwich mean time in minutes but also in seconds.

The Government made an attempt to reconstruct, from the tapes played in conjunction with each other and from stop-watch calculations, the precise times of communications on the Tower tape. The court does not believe that the accuracy of these calculations is precise enough to make the Government's case, especially in light of testimony as to the times in which certain events took place.

One of the witnesses, Carol Hartsfield, saw the crash from her apartment window and notified the Austin police. The records of the Austin Police Department and the Austin Fire Department reveal that this call was stamped at the conclusion of the call with the time as 11:38 p. m. The court has concluded that by the time Miss Hartsfield saw the plane crash, reacted to this startling event, walked to the telephone and was able to complete a call to the police plus the time in which the note of the call was stamped with the time, some time in the neighborhood of two minutes would have elapsed. Plaintiff's Exhibit No. 13–A, the weather log kept by the weather man on duty, Phaedon James Louis, indicated that the Austin tower notified him of the crash at 11:38. Allowing for the reaction of the personnel in the Austin tower, two minutes is still a reasonable figure. Furthermore, Robert Fletcher, testified that the N1661 approached the runway a "very, very short time" after the Braniff 255 landed. All of this taken together indicates to the court that the plane crashed at 11:36 p. m. The aircraft would have encountered the wake turbulence sometime before that.

The first officer of Braniff 255 was a Mr. Roesink. He testified that it was one of his duties to note the time of the landing of the airplane by looking at the in-board clock, remembering the time, and as soon as the plane had taxied to the terminal, putting the time in the log. The log indicates that Braniff 255 landed at the Austin airport at 11:31 p. m. CST. At the time it landed it ceased to generate wake turbulence.

Mr. Edgeman, expert witness for the plaintiffs, made some time calculations from the tapes and from the movement and approximate speed of N1661 and Braniff 255. He concluded that the time separation between the landing of Braniff 255 and the abortive landing of N1661 was 1¾ minutes. The court is not wholly convinced by these calculations but they constitute some evidence as to the time separation.

The weather in Austin, as revealed by the weather report and the testimony of those involved, was relatively calm. Winds at the time were approximately seven knots from 180°. John Choate, the airport air traffic controller involved, reported the winds to Farris just before the crash at ten knots, but the weather report, plaintiffs' Exhibit No. 13–A, never contains a report of surface winds that night in excess of seven knots. Mr. Fletcher also testified that it was a calm night with a light breeze. The ceiling was approximately seven miles. The weather at the time of the crash was not a factor in the cause of the crash or the abortive landing, except insofar as the presence of a light wind would have caused the dissipation of the wake turbulence to be rather slow and insofar as the direction in which the wind was blowing would have caused the turbulence to drift in the direction of the landing of N1661.

Taking all this evidence together, the court has concluded that the time between the landing of the Braniff Flight 255 and the abortive landing approach of N1661 was no more than three minutes.

## OBSERVATIONS OF THE AIRCRAFT

The experts on wake turbulence, Mr. Larry Edgeman and Dr. John Bertin for the plaintiffs and Dr. B. W. McCormick for the defendants, all agree that if a lighter aircraft encounters

wake turbulence upon an attempted landing, the aircraft would make a violent maneuver. The angle of entry into the vortex is critical. Dr. McCormick testified that a perpendicular entry would create no problem, but as the angle decreased from 90°, the violence of the maneuver would increase. Mr. Edgeman and Dr. Bertin described it as a roll and as a lurch or a jump upward. Dr. McCormick described it as a roll and, in the instance of the type of wake turbulence involved in this case, the roll would be a violent roll to the right if the angle of entry were somewhere in the neighborhood of 10° or less.

All of these descriptions of maneuvers are entirely consistent with Mr. Fletcher's observations of N1661 on the night in question, particularly those observations in which he describes the aircraft as making an abrupt turn to the right of approximately 30° to 40°.

Dr. McCormick testified that in his calculations, if an aircraft such as the N1661 encountered the type of turbulence involved in this case, and at the angle indicated by the approach of the aircraft, the aircraft would make a violent roll to the right of approximately 48½°.

The weather conditions, the time factors, and the observations of the aircraft, and the expert testimony lead the court to the conclusion that Braniff Flight 255 upon landing on runway 12R did generate wing-tip vortices which could be hazardous to a lighter aircraft attempting to land on runway 16R at or near the intersection of the two runways and that in the space of three minutes it had not dissipated to the extent that, by the time N1661 attempted to land, the turbulence was of no consequence to N1661. The court also finds that N1661 entered the wake turbulence generated by Braniff 255 at an angle sufficiently less than 10° to cause the violent, uncontrolled maneuver which ultimately caused the crash. Further, the court has concluded from a preponderance of the evidence that the wing-tip vortices generated by Braniff 255 did affect N1661 and did proximately cause the abortive landing of the aircraft.

A finding that the encounter with wake turbulence did proximately cause the crash of N1661 is not necessarily a finding that the Government is liable for the crash. There also must be a determination that the air traffic controllers on duty that night were negligent within the scope of their employment and that that negligence proximately caused the crash. In other words (1) the United States breached a duty owed to the passengers and pilot of N1661, (2) the breach of duty was a substantial factor in bringing about the crash, and (3) the crash was a foreseeable consequence of the breach. Spaulding v. United States, 455 F.2d 222 (5th Cir. 1972). The federal Tort Claims Act provides that the law governing a tort claim is the law of the state in which the alleged tort occurred. 28 U.S.C. § 1346(b). Texas law would therefore govern this case. General negligence law governs airplane tort cases. United States v. Schultetus, 277 F.2d 322, 325 (5th Cir. 1960), but the standard of care in such cases is unique. Both pilot and air traffic controllers are responsible for the safety of the airplane and its passengers. The pilot is in command of the aircraft and is primarily responsible for its safety. Without the air traffic controller, however, in some instances the pilot is helpless. Thus, he cannot be held legally responsible for his aircraft until he is apprised of all information material to its operational safety. Spaulding, supra, 455 F.2d at 226.

The air traffic controller is legally required to give all the information and warnings specified in his manuals. Cf. Gill v. United States, 429 F.2d 1072 (5th Cir. 1970); Ingham v. Eastern Airlines, Inc., 373 F.2d 227 (2d Cir. 1967); American Airlines, Inc. v. United States, 418 F.2d 180, 193 (5th Cir. 1969). At the time of the crash in question, the manual provided for a wake-turbulence warning. This point is more fully discussed below.

The controller has a duty to give necessary warnings simply because once the Government has assumed a function or service it is liable for negligent performance of that function. Indian Towing Co. v. United States, 350 U.S. 61, 64–65, 76 S.Ct. 122, 100 L.Ed. 48 (1955); American Airlines, *supra*, 418 F.2d at 192. Although the phenomenon of wake turbulence, its movement and effect upon following aircraft is not something that can be precisely determined, given the circumstances of this case, the presence and position of the two aircraft, the weather conditions, and the three-minute time separation, the air traffic controller was under a duty to warn the pilot of N1661 of the possibility of dangerous wake turbulence. Hartz v. United States, 387 F.2d 870 (5th Cir. 1968); Ingham, *supra*; Furumizo v. United States, 245 F.Supp. 981 (D.Hawaii 1965), aff'd 381 F.2d 965 (9th Cir. 1967).

Neither the Austin RAPCON nor the Austin tower at any time gave N1661 any warning as to the possibility of encountering any wake turbulence generated by Braniff Flight 255. It is undisputed in this record that N1661 was never notified of the presence of the Braniff flight, either prior to or after the landing of the airplane. Clearance was given to N1661 to land on either runway 16R or runway 12R without any notice to N1661 that the Braniff Flight 255 had just landed. The frequency with which N1661 was communicating with FAA controllers was not the same frequency with which the Braniff personnel were communicating with the FAA controllers.[5] At no time was Braniff 255 in a position in which N1661 could have seen it and have been aware that it was landing at the Austin Airport. Mr. Choate, the air traffic controller on duty that night, was, however, in visual and radio contact with Braniff 255 as well as N1661. The wake turbulence generated by Braniff 255 on that night was not seen and could not be seen or observed by the pilot of N1661 as he made his final approach. The only way in which N1661 could have learned of the possible presence of wake turbulence was through the air traffic controller.

The fact that wake turbulence can be hazardous to smaller aircraft was common knowledge on or before April 22, 1970, to the air traffic controllers on duty in the Austin and RAPCON towers. FAA publications and materials placed in the required reading binder for air traffic controllers set out some of the hazards of wake turbulence created by aircraft landing or taking off.

Although the testimony in this case from qualified experts differs as to the length of time the turbulence involved in this case would have remained in the area between the intersection of runways 16R and 12R and the end of runway 16R, the Airman's Manual, defend-

5. In this particular, the court also notices the discrepancies between the transcript of the communications between N1661 and the Atlanta Airport Tower and the communications between N1661 and the Austin FAA facilities. The communications between N1661 and the Atlanta Airport tower indicates that N1661 was notified of the location of air traffic in its vicinity as it made its approach to the Atlanta airport. In this regard, N1661 was notified as follows:

"Excaliber N1661, there is traffic twelve o'clock to you three miles eastbound at five thousand descending to twenty-five hundred. Do you see him?"
N1661 replied:
"We got him."
Again, from N1661:

"Okay. The one that is eastbound follow him; is that right?"
Atlanta Tower then stated:
"That's affirmed. One that passing about eleven o'clock to your eastbound, its a United 727."
The air traffic control manual, defendant's Exhibit No. 6, paragraph 266, on page 59, provides as follows:
"Describe the relative position of air traffic in an easy to understand manner."
And a note to this paragraph 266, contains the following example:
"Traffic, Eastern electra, on a down-wind leg to your left." "Twin bonanza en bound from outer marker from straight-in approach to runway 17."

ant's Exhibit No. 8, and the FAA Wake Turbulence Advisory Bulletin, defendant's Exhibit No. 19, state that pilots have reported vortex turbulence five minutes or more after the passage of another aircraft. Defendant's Exhibit No. 19, states:

"The best way of avoiding the vortex hazard is to know where they are most likely to be encountered and to act accordingly."

The Air Traffic Control Manual, defendant's Exhibit No. 6, paragraph 255 states:

"Wake turbulence: issue cautionary information to air traffic concerned if in your opinion wake turbulence will have an adverse effect on it." [6]

This provision was applicable at the time of the crash of N1661 and required a controller to give the specific warnings, "CAUTION, WAKE TURBULENCE" if the possibility of encountering wake turbulence existed. No further guidelines or criteria for determining the possibility of wake turbulence are given in the manual. No standards were established or relayed to the controller to assist him in making any judgment regarding wake turbulence. The decision to withhold this specific warning regarding wake turbulence was left to the controller.

Although such a serious hazard to flight operation required a specific warning, the only guidelines relative to wake turbulence relayed to the controller on duty that night was that wake turbulence could last for five minutes or more. No instruction, training, or data was given to the controller to tell him when such turbulence would last for a longer or shorter period of time. Under such information, however, the controller should have been aware of the possibility of a hazardous encounter from wake turbulence for a period of time beyond five minutes.

The court has found the time separation between the landing of N1661 and Braniff 255 was no more than three minutes and could have been a much shorter time from the evidence. Mr. Choate had visual contact with N1661 from a point at least one mile beyond the north end of runway 16R and up to and including the intersection of runway 16R and 12R. He knew or should have known that wake turbulence dangerous to N1661 might be present in the area between the intersection of 16R and 12R and the north end of runway 16R. Air traffic controllers are required to warn of dangers reasonably apparent to them when the dangers are not apparent to the pilot exercising due care. American Airlines, *supra*, 418 F.2d at 193. The danger to N1661 of the wake turbulence created by Braniff 255 and the short time separation between the two landings should have made reasonably apparent to Mr. Choate the possibility of danger to N1661 of wake turbulence. The situation should have lead him to warn N1661 of the danger. He did not do so, however, and N1661 encountered the turbulence, unprepared for its thrust. The negligence in failing to warn of the wake turbulence in this way proximately caused Dr. Farris to lose control of the aircraft, which control was never fully regained. Some minutes later the tragic crash occurred.

The possibility that N1661 would encounter the wake turbulence generated by Braniff 255 upon landing was a foreseeable danger to the air traffic controllers then on duty at the Austin tower. It was also foreseeable to the air traffic controllers that N1661 would encounter hazardous wake turbulence unless N1661 was warned of the possibility of such turbulence or the position and direction of travel of Braniff 255. Further, it was foreseeable to the air traffic controllers that without a warning from them or a notification to

---

6. The note to paragraph 255 reads:
   "Because wake turbulence is unpredictable, the controller is not responsible for anticipating its existence or effect."

This note is absolutely inconsistent with the regulations requiring the issuance of cautionary information.

N1661 of the position and direction of Braniff 255 that the pilot of N1661 would not be aware of the existence of Braniff 255 or the fact that it had generated wake turbulence across the landing path of N1661.

The court therefore finds that the Government, through its employee air traffic controllers, was negligent in these several respects:

(1) In failing to warn the pilot of N1661 of the possibility of encountering the wake turbulence generated by Braniff 255 as N1661 was attempting to land at Austin Municipal Airport on the night of April 22, 1970;

(2) In withholding a warning of "CAUTION, WAKE TURBULENCE" to the pilot of N1661 as that plane was attempting to land;

(3) In failing to inform the pilot of N1661 of the location and identification of other landing aircraft in the area, namely, Braniff Flight 255, as N1661 was attempting to land;

(4) In giving clearance to N1661 on the night of April 22, 1970, without informing the pilot of N1661 that Braniff 255 had made a prior landing on an intersecting runway to the runway on which N1661 was attempting to land;

(5) In spacing, positioning, and clearing Braniff 255 and N1661 to approach, land, and attempt to land under the circumstances and conditions then known to the air traffic controllers on duty;

(6) In giving clearance to N1661 to land at the Austin Municipal Airport without giving such aircraft the warning, "CAUTION, WAKE TURBULENCE" as part of that clearance;

(7) In failing in any way to apprise the pilot of N1661 of either the fact that a larger jet aircraft was landing upon an intersecting runway or that there was a possibility of wake turbulence across the landing path of N1661 so as to allow the pilot to take whatever evasive actions he would be able to take to properly and safely land the aircraft and the passengers aboard such aircraft.

This negligence on the part of the Government's employees was a proximate cause of the abortive landing and subsequent crash of N1661. The abortive landing and crash were foreseeable consequences of the negligence.

There is no evidence in the record which would raise the defense of assumption of the risk. Accordingly, the court concludes that Mr. Dickens did not assume the risk of traveling in N1661 piloted by Dr. Farris.

## CONTRIBUTORY NEGLIGENCE

The Government has contended that the crash was caused either by the malfunction of the aircraft or by the pilot's actions. There is no evidence that the aircraft was malfunctioning at the time of the abortive landing. There is, however, an indication that Dr. Farris contributed to the abortive landing. When the wreckage of N1661 was examined after the crash, its landing gear was found to be up. When Fletcher voluntarily wrote out his statement he said that he was "fairly certain" that the landing gear was up as the N1661 approached for landing. At the trial under cross-examination he reiterated the conclusion he had reached at the time he wrote out his voluntary statement. Several witnesses testified that they saw that, on its approach to land, N1661's landing lights, which are controlled by the landing gear, were not on. The absence of landing lights would indicate that the landing gear was not down. From this testimony the court has concluded that the landing gear of N1661 was not down in landing configuration as the airplane approached runway 16R for a landing.

There was testimony that if the landing gear was not down a plane such as the N1661 would indicate the failure to lower the landing gear by a horn which would sound as the plane slowed to landing speed. The court finds that as Dr. Farris approached runway 16R the warning horn went off. That alone would not have caused an experienced

pilot such as Dr. Farris to panic. That warning horn sounding at the same time as the aircraft encountered the wake turbulence of Braniff 255, however, could have caused Dr. Farris to panic and lose control of the aircraft. Judging from the speed of the aircraft at the time it approached the intersection of runways 16R and 12R, the court finds that the aircraft encountered the wake turbulence at approximately the same time as the warning horn went off. The two occurrences at the same time caused Dr. Farris to panic. His panic is clearly indicated by his last voice transmission to the control tower, discussed earlier.

A proximate cause of his panic was Dr. Farris' own failure to lower his landing gear. The court therefore holds that Dr. Farris and the Government employees were joint tortfeasors in causing the crash of N1661.

DAMAGES

■ The question of damages, like the question of liability, is governed by Texas law. The Government has raised the question of the effect of Mrs. Dickens' settlement with Dr. Farris' estate in an earlier state court suit. The old law in Texas was that a settlement with one joint tortfeasor operated as a settlement as to all tortfeasors, there being but one satisfaction for a judgment. The Supreme Court of Texas in McMillen v. Klingensmith, 467 S.W.2d 193 (Texas 1971) changed the law to disavow this "unity of release rule." Since the agreed judgment between the Dickens family and the Farris estate was signed March 6, 1972, after the *McMillen* case was decided, it is clear to the court that the unity of release rule would not be appropriately applied here.

■ The Government has contended further that even if the unity of release rule is inapplicable, the agreed judgment in the state court constitutes complete satisfaction of all claims arising out of the incident. The Government bases its position on a recitation in the agreed judgment which states that the judg-

ment is "in full and final settlement of all claims, demands and causes of action, whether known or unknown, which have arisen or may arise as the result of the accident in question." Since the United States Government was not party to the settlement agreement, the court holds that the recitation cannot benefit the Government. The Texas rule is that agreed judgments are in the nature of contracts and are to be construed in light of all the circumstances. *Cf.* Edwards v. Gifford, 137 Tex. 559, 155 S. W.2d 786 (Tex.1941), and Frazier v. Hanlon Gasoline Co., 29 S.W.2d 461, 470 (Tex.Civ.App.—Eastland, 1930). Furthermore, 12 Tex.Jur.2d "Compromise and Settlement," § 4 "Effect of Compromise Agreement," points out "The agreement does not benefit those who were not parties to it . . . ." and "[A] compromise does not bar a suit on matters not within the contemplation of the parties." This court does not believe that the Dickens family contemplated that their settlement with the Farris estate as the final satisfaction of their claim.

■ The court will therefore treat the settlement judgment as a release of the claim on the Farris estate only.

The case is governed, however, by the rule in Palestine Contractors, Inc. v. Perkins, 386 S.W.2d 764 (Tex.1964), and Leong v. Wright, 478 S.W.2d 839 (Tex. Civ.App.—Houston 14th Dist.1972). As the Fifth Circuit said in Gill v. United States, 429 F.2d at 1078 (5th Cir. 1970):

"Under Texas law if the pilot was a joint tortfeasor the settlement with his estate by the plaintiffs entitled the government to a reduction of the judgment against it by one-half."

Since the court has found that Dr. Farris was a joint tortfeasor in this case and since the Dickens family has settled with his estate, the court is compelled to divide the award by one-half.

■ The evidence in this case leads to the inescapable conclusion that the decedent, Jimmy Doyle Dickens, was in-

deed an outstanding young man. His academic and extracurricular career has been reviewed in considerable detail during the trial and the evidence shows clearly that he was a person of noteworthy achievements. After he married and became the father of two baby girls, he was a devoted father and a dedicated head of the family. He had achievements at The University of Texas Medical School which were superior. The pattern of his life had been cut, and had he not met with an untimely death, he would have continued in this pattern of excellence, absent some intervening mental or physical health problem. There was no evidence, even indulging in the most extreme speculation, that there would have been any such problem in his future.

True, the court must engage in some speculation and conjecture, although it is entirely reasonable to do so in this case, in order to conclude that Mr. Dickens would have continued his professional career aspirations and become a successful neurosurgeon with a practice which would have continued throughout the remainder of his life. In this respect, the court must follow the Texas rule on damages and has relied heavily on the following quotation from McIver v. Gloria, 140 Tex. 566, 169 S.W.2d 710 (Tex.1943):

"In a personal injury suit the amount which the plaintiff might have earned in the future is always uncertain and must be left largely to the sound judgment and discretion of the jury . . . . No general rule can be laid down, except that each case must be judged upon its peculiar facts, and the damages proved with that degree of certainty of which the case is susceptible . . . . Where plaintiff is a child, who has never earned any money, the jury must determine the value of its lost earning capacity altogether from their common knowledge and sense of justice . . . . "

The court has further relied upon the following quotation from Chief Justice Spurgeon Bell in Consolidated Casualty Insurance Company v. Smith, 309 S.W. 2d 80 (Tex.Civ.App.—Houston 1958, err. ref. n. r. e.):

"In determining diminished earning capacity, you would not consider alone the ability of the workman to do the immediate type of work he is on . . . . "

In Fowler v. Pedlar, 497 S.W.2d 399 (Tex.Civ.App.—Houston 1973, no writ history), the Court of Civil Appeals reformed the judgment of the trial court from which was eliminated the amount allowed by the jury for the loss of earning capacity in the future. The Appeals Court increased the damages awarded by that sum and said:

"It is clear that at the time of his injury he had not reached his potential earning capacity . . . . Since appellant was a student at the time of his injury . . . . the amount of lost earning capacity must be determined by the jury largely from their common knowledge and sense of justice."

The only evidence received by the court on the question of the loss of future earning capacity of Jimmy Doyle Dickens was that presented by the plaintiff's expert economist, Dr. Mayor. Dr. Mayor's testimony, the basis upon which he made his calculations, and the calculations themselves were reasonable and in accord with this court's "common knowledge and sense of justice." The court has also applied its "common knowledge and sense of justice" to a determination of an inclusion in the award of an amount representing the present cash value of Jimmy Doyle Dickens' care, counsel, advice, protection, and support to his family throughout his life.

At the court's suggestion, Dr. Mayor wrote a letter addressed to the court in which he made some calculations and arrived at his opinion of an amount appropriate to reduce the award in light of the fact that the court knows that had Jimmy Doyle Dickens lived he would have paid income taxes upon any amount that he earned. The calculations Dr. Mayor made and the opinions he reached

on the income tax question are contained in the letter to the court marked Plaintiff's Exhibit No. 21. The court has adopted Dr. Mayor's opinions on the damages to be awarded in this case. The sum which the court has determined represents the total present cash value, taking into consideration all of the proper elements of damages applicable to this case.

The court has considered the Government's point that the amount of damages should be limited to the amount of the administrative claim, pursuant to 28 U.S.C.A. § 2675(b). Its position is of no import in this case because, although the total award is in excess of that administrative claim, the amount actually recovered from the Government will be substantially less than that sum.

The total damages that the court has found reasonable is $2,500,000. Because the court has found Dr. Farris a joint tortfeasor, in light of the Texas rule discussed above, the total amount must be divided by one-half so that the actual damages awarded to the plaintiffs in this case are $1,250,000. The costs of court are to be assessed against the defendant.